Booth, Chief Justice,
delivered the opinion of the court:
The plaintiff is a New Jersey corporation. In the years 1915, 1916, and 1917 plaintiff entered into 32 separate contracts with the defendant to construct and deliver 32 submarine torpedo boats. The total original consideration for the entire undertaking was $23,806,000.00. Under the contracts the vessels were to be delivered at stated times, and express provision was made reserving to the defendant the right to make changes in plans and specifications. Changes were made and the vessels were not delivered upon the contract dates. Time for completion of the vesesels was duly extended by the Government, and they were accepted without the imposition of deductions as meeting requirements under this stipulation. This case is due exclusively to the interposition of war conditions, and the amounts claimed as losses are predicated upon alleged contracts of reimbursement for such losses, recognized by and due wholly to acts of the Government whereby the cost of completing the contracts was greatly enhanced. The facts, not particularly involved but somewhat extensive, are as follows: The President on March 22, 1917, issued a proclamation suspending the provisions of the eight-hour law in Government contracts and thereby established a new standard for labor, resulting in the authorization of overtime work and wages. This was immediately prior to our entrance into the war. Subsequent to this latter event the Navy Department adopted the policy of constructing destroyers and giving this form of construction precedence over all other construction work. The plaintiff had sublet to the Fore River Shipbuild *363 ing Company and ilie Union Iron Works certain construction work under its Government contracts for submarines, and the Government had made eighty-five contracts with the above-named corporations for the immediate construction of destroyers. We need not advert in detail to contemporaneous labor conditions and the strenuous effort to procure immediate augmentation of naval vessels. As a matter of fact, the necessity for the program which followed April, 1911, was in a large measure anticipated prior to that date. The plaintiff beyond doubt was faced with a condition in nowise contemplated when its fixed-price contracts for submarines were entered into. The Navy Department recognized the existing state of affairs and with commendable expedition set up the Shipbuilding Labor Adjustment Board. This board was the result of agreements dated August 20, 1917, and December 8, 1917, between the Secretary of the Navy, the chairman of the United States Shipping Board, the general manager of the Emergency Fleet Corporation, and officers and representatives of several of the labor unions involved. Within the purview of the board’s jurisdiction under the agreement were the vital and important subjects of the adjustment of labor disputes concerning wages, working hours, and working conditions in shipyards having contracts for the construction or repair of vessels for the Emergency Fleet Corporation and the Navy Department. On November 4, 1917, the board established a minimum wage scale for the Pacific coast, retroactive to September 22, 1917 — a wage scale affecting the Union Iron Works Company, plaintiff’s subcontractor — and from time to time thereafter issued decisions affecting the general wage scale. The plaintiff, while not a party to the above agreement, put into effect the board’s decisions respecting wages and working conditions. When bonuses were paid by other contractors the plaintiff adopted the same policy, and without exception the plaintiff observed the decisions of the board and paid wages accordingly.
On March 29,1918, the plaintiff in writing brought to the attention of the Secretary of the Navy the seriousness of the situation respecting the increase in cost and financial *364 loss involved in the continuance of its subcontractors’ work under their contracts with the plaintiff, and expressly pointed out that both the Union Iron Works, of San Francisco, California, and the Fore Kiver Shipbuilding Company, as well as the plaintiff’s own subsidiary, the New London Ship & Engine Company, of Groton, Connecticut, were faced with increased cost of construction which the fixed price of its contracts could not absorb. This letter was never answered. It was followed by a personal interview between the vice president of the plaintiff company and the Secretary of the Navy. The result of the interview is admittedly found in the reference of the matter to Admiral Capps, in control of matters respecting cost-plus contracts, the plaintiff’s vice president seeking a change of contractual relationship as to compensation to be paid for the work from fixed-price contracts to a cost-plus basis. The Secretary of the Navy assured the plaintiff’s vice president that the plaintiff would be dealt with on a fair and equitable basis. Admiral Capps, as senior member of the Compensation Board, transmitted to the Secretary of the Navy his report and recommendations covering the subject matter of the reference on April 29, 1918. This recommendation concretely stated in five precise paragraphs may, we think, be epitomized as follows:
The department, to meet the unusual situation on an equitable basis, should authorize reimbursement to both the prime contractor and its subcontractor on a basis substantially equivalent to the increase in wages authorized for other shipyards in the vicinity; that the adjustment should be determined under the stipulation in the contracts authorizing changes therein, after the plaintiff had submitted its original estimate of actual cost under its fixed-price contracts in such detail as to enable the department to accurately determine the increased costs. Overhead expense was to be so adjusted under changed conditions as to preclude allowance of profits, and in no event to include profits in excess of 10%, including bonuses on the basis of the plaintiff’s fixed-price contracts.
On April 29, 1918, the same day the Oapps report was received, the Secretary of the Navy indorsed thereon a ref *365 erence of the same to the solicitor of the department, via the “ Bureaus of Construction and Repair and Steam Engineering and Compensation Board,” in which the secretary expressly stated that the cost of the changes involved would be determined by either the Board of Changes or the Compensation Board, in accord with the applicable contract provisions of the various contracts. Plaintiff received a copy of the above recommendations on May 13, 1918, and on June 4, 1918, was officially advised of the action taken. Immediately thereafter another letter was addressed to the secretary by the plaintiff, pointing out the necessity for interpreting certain provisions in the report, and soliciting from the secretary authorization for ad interim, payments on account of the additional cost of both direct and indirect labor, emphasizing the importance of the latter allowance because of the obvious delay in reaching final adjustments in detail. Later on the above letter was supplemented by a personal interview with the secretary, in which the plaintiff stated its inability to submit estimates of the original cost of the vessels under its contracts, due to the fact that its original bids were lump-sum bids submitted without segregation of this item, and therefore had no available data from which it might be obtained. Without going into detail as to the numerous references and indorsements thereon, it seems adequate for the purposes of the case to state that the real controversy revolved around the single issue of arriving at a just and demonstrable allowance predicated upon the difference between the estimated cost of the vessels under the plaintiff’s contracts and the increased cost ascribable to the Labor Adjustment Board’s increase of wages, etc. The Secretary of the Navy summed up the position of the department in his letter of August 27, 1918. After stating that the department had previously directed reimbursement, express reference was made to the fact that two questions were alone involved. “ First, the amount of compensation to be paid the men, and, second, how much of the increase in this compensation shall be paid by the department. The first question is in no way dependent upon the second, for while the department .fully realized the cost of labor increases it is not informed as to whether *366 those increases were not anticipated by the Electric Boat Company from the beginning.” Therefore, it is apparent that the single factor forestalling conclusive action existed in the inability of the plaintiff to furnish the estimated cost of the vessels at the time it submitted its bids. The Secretary in closing the above communication admonished the contractors that failure to perform their contracts would be charged if the company suspended operations or exhibited an unwillingness to put the increased wage scale into effect. Subsequently on September 18, 1918, the plaintiff in a letter to the Compensation Board, reiterated its inability to supply accurate data as to its estimate of original cost of the vessels, supplemented its earlier report to the board made July 31, and called especial attention to impending financial embarrassment due to increased cost of construction. The board expressed; an unwillingness to Recommend complete reimbursement for losses already incurred, but did, however, recognize the plaintiff’s present financial condition, and recommended the immediate payment to the plaintiff of $700,000.00 stating the board’s belief that the sum suggested approximated 50% of the increased direct labor cost and would serve to tide the plaintiff over temporarily, closing the recommendation with a statement that further allowance should be determined by an examination of plaintiff’s books of account by the Bureau of Supplies and; Accounts under the supervision of the Bureau of Construction and Bepair and the Bureau of Steam Engineering, to which bureaus the whole matter should be referred. In October, 1918, the above bureaus approved the Compensation Board’s recommendations, advised the payment of $700,000.00 to the plaintiff upon the giving of proper security therefor, and thereafter, on October 31, 1918, with the express approval of the Acting Secretary of the Navy, the $700,000.00 was paid the plaintiff in accord with the bureaus’ terms and conditions.
On October 31, 1918, the Labor Adjustment Board notified the plaintiff as to new wage schedules to become effective October 1, 1918, and plaintiff again, at its request, received written assurances that it would receive reimbursement for1 the additional costs to be incurred in performing its con *367 tracts on the basis of changes in its contract provisions. The new wage schedule did go into effect and the plaintiff conformed thereto. No further payments as to this particular matter were made to the plaintiff. During the greater portion, if not during all this period, the plaintiff’s assistants and the defendant’s cost inspectors, acting under occasional advice from the Compensation Board, were engaged in examining plaintiff’s books of account and compiling therefrom a statement as to the amount which would ultimately and finally be sufficient to reimburse the plaintiff for the increases it had been forced to incur. Manifestly this was a task of magnitude and importance, involving not only expert accountancy but tedious length of time. In January, March, and April, 1919, the plaintiff by letter put before the Secretary of the Navy its then status with respect to the contracts involved and its present financial needs, expressed an indifference as to the method of reimbursement if it reflected the true extent of the loss, and closed with a suggestion of an additional advancement and the abandonment of the existing contracts, a new contract to be entered into for the completion of the vessels on a cost-plus basis. Plaintiff’s new proposition, i. e., a new cost-plus contract, was considered in a conference composed of plaintiff’s vice president; the Acting Secretary of the Navy; Admiral Capps; the Solicitor of the Navy Department, and the acting chiefs of the Bureaus of Construction and Repair and Steam Engineering. The plaintiff positively stated to the assembled conference that the company had reached the point where it could not go forward with the construction of the vessels without relief in the form of a cost-plus contract. The conferees assented to the change, and decided upon its adoption, if in the opinion of the Comptroller of the Treasury such a change could be legally effected. The Comptroller of the Treasury in his opinion advised the Solicitor of the Navy Department that the proposed relief could not be afforded as a change under the contract, but could be accomplished by a supplemental contract. Thereafter the Acting Secretary of the Navy approved the alteration of the plaintiff’s contractual relationship with the de *368 partment, stated his willingness to consider a supplemental contract so drawn as to impose the cost of increases due to increased wages, etc., upon the Government, and left open for future determination the rate of profit to be paid the plaintiff. Such a contract was, on April 29, 1919, drafted by the solicitor of the department, referred to the official and bureaus designated in Finding X and subsequently altered and redrafted and finally after several months for some undisclosed reason was never signed by either party.
In April, 1920, the plaintiff appealed to the Secretary of the Navy for the appointment of a naval board to consider its claims for reimbursement. In May, 1920, the Secretary of the Navy created the Baxter Board, a board composed of five naval officers, and to it committed the consideration of plaintiff’s claims. This board made a finding recommending a total allowance to the plaintiff of $3,392,023.50, from which was to be deducted the $700,000.00 previously advanced, leaving as due the plaintiff $2,692,023.50. On April 13,1921, a board on changes, created by the Secretary of the Navy, reported an allowance due the plaintiff for changes of $141,302.34 instead of $134,782.51 allowed by the Baxter Board. The findings of the Baxter Board were disapproved by the Navy Department, and on June 21, 1922, the Taylor Board came into existence. The Taylor Board report is found in Finding XIII. The controversy culminated on November 16, 1923, by the Navy Department denying legal liability to make any reimbursements, predicating its opinion upon the absence of authority so to do without supporting legislation, and hence the plaintiff received no payments except the $700,000.00 heretofore mentioned, and for the recovery of which the defendant interposes a counterclaim.
The final petition of the plaintiff prays for a judgment of $5,020,712.70 and “ such rate of profit as the court maj? deem just and equitable.” The right of recovery under this phase of the litigation is rested upon the proof of an alleged cost-plus contract as recited in detail in Findings IX and X. Doubt as to a preliminary oral agreement between the parties respecting the making of a cost-plus contract to take the place of plaintiff’s existing fixed-price contracts is removed by the record. An agreement embodying the matter *369 was drafted, the Comptroller of the Treasury had advised as to its legality, and why it was not executed does not appear. If the plaintiff’s contention as to the liability of the Government was solely dependent upon this state of the record, it would be invulnerable. It is true that the interested parties designated the agreement as a supplemental contract. However, the designation was but an expression. The transaction, it seems to us, in all its phases involved not a supplemental contract but an entirely new and original undertaking, i. e., a complete substitution both in form and substance for the terms and conditions appearing in plaintiff’s original contracts. The consideration for the performance of the plaintiff’s original undertakings was fixed definitely in each of its thirty-two contracts. To radically change the method of payment and reward the plaintiff upon a basis so decidedly distinct as cost, plus a profit, involves, it seems to us, much more than the mere supplementing of the original stipulations by an agreement or agreements recognizing incidental troubles and expenses growing out of the performance of the contracts, which by their very nature could be paid and leave undisturbed the original contracts and the undertakings thereunder. In the one case it is an agreement to make good an unforeseen loss; in the other, a new contract embracing new contractual relationships. It is in our judgment a vastly different thing to agree to assume liability for increases in costs due to the necessities of the Government in a time of emergency, which might, if not assumed, ruin a contractor, and to completely change the terms and conditions of an existing contract and enter into another of a separate and distinct type to replace the former. The record signally emphasizes what we mean. In 1919, four years after the first contracts and two years after the last, an oral agreement is proposed by which the Government is to retroactively assume cost prices for all the construction work performed by the contractor and add thereto a fixed profit as a substitution for obligations, definitely fixing in stated sums the amounts the Government was to pay, which included the contractor’s cost of performance and profits. In the contracts as they existed the risk was voluntarily assumed by the contractor. In the *370 proposed substitution it is transferred by entirely new obligations to the Government. This we think is at variance with a proposition supplemental in its nature to simply reimburse the contractor for actual losses sustained, due to unforeseen events not within the control or contemplation of the parties when the contract was made and of such nature as to warrant and furnish consideration for the Government’s action by way of securing prompt delivery of the vessels and avoiding labor troubles, inescapable under the prevailing conditions. In the- first case, as to a cost-plus contract, section 3744, Revised Statutes, applies and the contract must be in writing; in the other we think the case of E. W. Bliss Co. v. United States, 61 C. Cls. 777, reversed by the Supreme Court November 29,1927, is apropos.
The defendant insists that the record does not sustain a supplemental contract to reimburse the plaintiff for. increases-in cost of construction due to increased wage scales; that the advanced scale of wages promulgated from time to time by the Labor Adjustment Board and overtime wages fixed were voluntarily paid by the plaintiff without express order or the slightest compulsion upon the part of the Government. Aside from the positive facts negativing the above contention, we think the record unmistakably warrants the inference that the element of voluntary assent to the changed conditions is distinctly lacking. The contractor could, if so disposed in time of war, have stood upon his contract rights, and the Government might have done likewise. The statement needs no demonstration. We are not concerned with what the parties might have done; the case is the outgrowth of what was done. To assert that a contractor confronted with an acute paucity of labor in a position to demand increased wages and overtime working hours voluntarily meets the demands when he is without recourse to do otherwise, and thereby absorb all his contemplated profits and perhaps encounter financial embarrassment in addition, is to take away from the word “ voluntary ” that freedom of choice the word imports. This record discloses the fact that the plaintiff had available under the existing conditions and the terms of its contracts a *371 choice between two methods of procedure, one to patriotically acquiesce in the Labor Adjustment Board’s decision and proceed with the performance of its contracts; or remain adamant and face a strike of its employees, which would have excused performance. The Government realized the situation and met it with promptness and positiveness.
Counsel for the defendant from a very able and careful analysis of the record deduces a conclusion that the proven facts at best establish an agreement upon the part of the Government officers to do no more than consider1 the plaintiff’s claim, and that an agreement to consider claims creates the single obligation to fix the mind thereon, examine into, and at some future time render a definite conclusion, and in this case no final conclusion was reached; in other words, consideration was all that obtained. The subject matter before the Secretary of the Navy and other responsible officers of the department was a contention for an agreement to pay the plaintiff for excess cost of production, due to the increased wage scale. It involved serious consideration, first as to the legal right to grant the request, and, secondly, the extent of the liability to be assumed. The expressed intent of the Secretary indicated at the initiation of the controversy was to do justice and equity, and the subsequent proceedings as the court finds from the record resulted in an agreement, as the result of consideration, to reimburse the plaintiff when a legal way should be found to do so. The single disturbing factor to a consummated written understanding was what route to take; not that all routes should be closed. If, then, the Secretary was in accord with the claim presented by the contractor, and consented to his claim, the fact that he misconceived his legal authority in the premises does not remove from the negotiations the important element of mutuality. We think the record is replete with facts which clearly demonstrate a condition wherein had the Secretary had before him the decision of the Supreme Court in the Bliss case this litigation would not have followed. To consider, as usually employed in legal proceedings, conveys the meaning of consideration and adjudication. The Secretary was not, we think, using the *372 word “ consider ” in a restricted sense. It was the established policy of the defendant to recognize the existence of the manifest equities of contractors situated as the plaintiff was, and the record sustains a conclusion that those in authority were in agreement with an obligation to pay, and that all that was left to be done was to find the lawful way in which it could be accomplished. If an authorized official of the Government receives a contention for the allowance of claimed rights, and assents to consider it, and by a series of acts thereafter, indicating careful investigation of the claim in all its details, reports that the claim is just and should be allowed, it is difficult to perceive the absence of an agreement upon the merits of the controversy on the single basis that failure to carry out the award is due to a misapprehension of lawful authority to proceed to payment. The various steps taken in relation to plaintiff’s claim, the voluminous correspondence, the repeated investigations of the books of the company, and numbers of reports made, in not one of which appears a dissent the justice of its allowance, bring, we think, the parties into such a relationship that the court is without authority to do aught else except to find the existence of a contract, such as is relied upon by the plaintiff, to pay the loss suffered.
We have no difficulty, in view of the findings, in holding that a supplemental agreement to reimburse the plaintiff for its increased costs of production, due to the waiver of the eight-hour law by the Government and the wage increases established by the Labor Adjustment Board, with the approval and assent of the Government obtained. From the beginning of the long controversy to its finality there exists but one positive statement that in anywise negatives the Government’s complete assent to reimburse the plaintiff, and that one statement made in 1923, five years after the close of hostilities, in the face of an express opinion from the Comptroller of the Treasury previously given that an agreement might be legally consummated to care for the situation, is rested not upon a denial of the existence of such a contract, but wholly upon a question of legal liability to make the reimbursements.
*373 We have set forth an extensive and tedious summary of the facts; it is useless to recite the numerous written docu- • ments passing between the plaintiff and the defendant with reference to reimbursement. Suffice it to say that the letter of the Secretary of the Navy, dated August 27,1918 (Finding VIE), recites: “Under date of April 29, 1918, the department directed that the Electric Boat Company should be reimbursed on account of the increased cost of labor directly employed by it and by the New London Ship & Engine Company.” Thereafter $700,000.00 was paid to the plaintiff. Again, in Finding VIII, appears a positive statement that additional costs due to the “ new Macy scale ” will be met under the same conditions as appear in the defendant’s order of April 29. These two excerpts, standing apart from the unbroken continuity of express promises to reimburse, are sufficient to sustain the plaintiff’s contention. The one misgiving, the single prevailing doubt in the mind of the Navy Department, was as to the legal method to be adopted whereby the supplemental contract might be made effective. If, then, the minds of the parties met and the supposed legal impediment may be removed, do we not have beyond peradventure a consummated agreement? The Bliss case, supra, we think, furnishes the answer. The Supreme Court said in the Bliss case: “ The court is of opinion that the Secretary of the Navy had authority to make further contracts to pay the petitioner the increased costs resulting from the wage increases put into effect at the Secretary’s instance, in the course of the petitioner’s performance of the original contracts, and that the findings of the Court of Claims show that such further contracts were made and were based upon an adequate consideration, consisting of both advantage to the Government and detriment to the petitioner.” The Bliss case discloses no more convincing state of facts than this case, and the proceedings in this case and the BTAss case were contemporaneous. See also Savage Arms Corporation v. United States, 266 U. S. 217; Russell Motor Car Co. v. United States, 261 U. S. 514; United States v. Swift & Co., 270 U. S. 124; American Smelting & Refining Co. v. United States, 259 U. S. 75.
*374 It is hardly essential to continue tbe discussion on this branch of the case. We think the facts establish a true supplemental contract, i. e., one emanating from and directly traceable to difficulties inherent in the performance of the plaintiff’s obligations under the original contracts, due directly to governmental emergencies and imposed upon the contractor at the instance of the Navy Department, as appears, in Finding VII, from the Secretary’s letter of A.ugust 27, 1918.
In the course of the Navy Department’s efforts to check the books of accounts of the plaintiff the Baxter Board adopted a method of ascertaining increased cost. The report of the Baxter Board (Finding XI) reflects its efforts and discloses that it is the result of an exhaustive examination of plaintiff’s books and records up to August 30, 1920, asserting in addition that the report reflects “ actual cost and damage ” as per directions contained in the precepts. The Taylor Board (Finding XIII), in its report, materially reduced the findings of the Baxter Board. The Taylor Board succeeded the Baxter Board following the disapproval bjr the department of the Baxter Board’s report. The plaintiff assented to the correctness of three findings of the Taylor Board, but declined to accept the remaining ones. The Judge Advocate General sustained plaintiff’s objection to one finding. The final conclusion of the effort to satisfactorily reach an amount terminated in the plaintiff’s refusal as above mentioned, and the defendant’s determination of an entire absence of legal liability for any of the increases. The single available source of evidence to establish the amount of the increases, aside from Government records of the rates of increases, was the plaintiff’s books of account. Of course, difficulties were to be encountered in ascertaining with indisputable exactness, to the very penny, the amounts expended by the plaintiff in meeting the increases. Thirty-two contracts, representing a consideration of almost twenty-four million dollars, were involved, and it is not to be expected, nor is it required under the law, that the bill of damages shall measure up to a greater degree of certainty than is required in cases of this nature. Transactions like this ex *375 tending over a long period of years, involving extensive and detailed accounting, lend themselves to expert accountancy, and if the court is convinced that the evidence offered is sufficiently certain to sustain the expenditure at least of the amounts proven, we think the plaintiff entitled to a judgment therefor. Daughetee v. Ohio Oil Co., 263 Ill. 518; Anvil Mining Co. v. Humble, 153 U. S. 540. The precept creating the Baxter Board contained specific directions as to subject matter of investigation and items of increase. Six factors involving allowances were enumerated. They appear in the second paragraph of Finding XI. The plaintiff, employing its own method of audit, ascertains a sum much in excess of the Baxter Board totals. The court, in reconciling the testimony, giving effect to plaintiff’s willingness to accept the Baxter Board’s method of investigation and computation, has reached the conclusion that the supplemental contract established extended only to reimbursement for the increases due to extra cost of labor under the scale of wages put in force by the Labor Adjustment Board. In so doing we accept the plaintiff’s proof in this regard as sufficiently certain to establish the payment of the amounts claimed for extra cost of police, extra cost of retroactive wages, and extra cost of the Government wage increase, a total of $3,783,732.64, less $700,000.00 advanced, leaving a balance of $3,083,732.64 due the plaintiff. The amounts relied upon are taken from the plaintiff’s books, are much less than the plaintiff’s audit discloses, and represent in dollars and cents what the books show as extra costs incurred.
We think the settled rule as to damages is that they are not to be denied because they may not be susceptible to indisputable accuracy. The test to be applied is, Have the sums claimed been calculated upon a reasonable basis, and under all the circumstances of the case does the claimed amount reflect the proximate injury? If the element of speculation is absent, if the basis of computation is the usual and customary one followed in cases of a similar character, and the court is satisfied that the method of computation employed reflects with reasonable certainty the extent of the loss, judgment may be predicated upon this *376 basis. Especially is this true where the loss was occasioned by some act of the defendant. Eastman Kodak Co. of New York v. Southern Photo Materials Co., 273 U. S. 359, 378. Recurring to the fact that the original contracts in this case were peace-time agreements; that construction work had proceeded thereunder, both under the contractor and subcontractor; that the volume of work and the extent of accounting were immense, there is little room for doubt that a result reached by the audit of plaintiff’s accounts by a method of accounting adopted by disinterested parties possesses far more probative effect than were it otherwise. The defendant, if we correctly apprehend the contention, does not challenge the existence of a loss, if the contract to reimburse is established. It is the method which is attacked. An analysis of the computation, it ia claimed, discloses the fact that within the totals relied upon there are buried amounts foreign to the item of extra cost of labor, and which are cared for by the terms of the original contracts, i. e., certain sums for which claim could only be asserted under the method the original contracts set up, such as changes made in the original drawings, plans, etc., wherein the contracts provide an exclusive way for extra or diminished cost, and to the same effect the extra costs due to premature launching of the vessels, etc, etc. If the facts upon which the defendant relies exist the contention is invulnerable, for it is clear that past settlements in accord with the contracts are closed incidents, and inasmuch as they comprehended extra or diminished costs of construction, the boards provided for in the contracts possessed conclusive authority to finally determine the issue (United States v. Gleason, 175 U. S. 588; Moran Bros. Co., 61 C. Cls. 73), and may not now be included in the ascertainment of damages. The difficulty in the way of according weight to this particular defense lies in the fact that the judgment to be awarded in this case is not predicated upon a cost-plus basis, but is limited to the increased wage scale the plaintiff j>ut into effect and for which the defendant agreed to reimburse the plaintiff, a supplemental agreement by the terms of which the Government assumed the expense of increased wages and addi *377 tional cost due to what the Government required of the contractor. So that we are alone concerned with this single item and not the cost of the vessels. If the evidence offered reflects what the plaintiff was paying in wages prior to the inauguration of the increased scale and what followed thereafter, with reasonable accuracy we think the computation sufficiently certain to exclude the element of conjecture and speculation. It will be noted that column 6 of the tabulation set out in Finding XIY is a detailed computation of the great number of changes ordered under the original contracts from time to time, and Finding XV recites the inability of the court to accept it as accurate. This fact, supplemented by the court’s conclusion that the right of recovery is limited to the sums stated in columns 2, 3, and 4, we think conclusively removes from the case the apprehended danger on the part of the defendant of duplication of costs and payments.
“Where the originals consist of numerous documents which can not be conveniently examined in court, and the fact to be proved is the general result of an examination of the whole collection, evidence may be given as to such result by any person who has examined the documents and who is skilled in such matters, provided the result is capable of being ascertained by calculation. This has been permitted when another course would cause great loss of time and tend to confuse the jury; and competent witnesses have been allowed to summarize the accounts and to state conclusions as to balance, solvency or insolvency, and the like. Of course, the court may require the production of the originals if this is deemed necessary.1'’ (Jones on Evidence, civil cases, p. 254.) ' . J
The proof offered is in our opinion the best evidence of the loss available, and establishes with certainty the extent of the same. The judgment awarded is not the judgment sought in the petition, plaintiff contending for the amount of increases plus a reasonable profit. The court, however, is authorized under our forms of pleading to award a judgment in accord with the facts stated and proven, notwithstanding the absence of a count in the pleadings for the particular recovery. Wood et al. v. United States, 49 C. Cls. 119; Clark v. United States, 95 U. S. 539.
*378 The defendant in the brief raises an issue of jurisdiction. The contention is predicated upon the act of March 4, 1925, 43 Stat. 1273. We think the Bliss case, supra, disposes of the argument. In any event, the statute relied upon afforded no exclusive relief and, unlike the case of United States v. Babcock, 250 U. S. 328, created no exclusive forum.
The defendant’s counterclaim will be dismissed. Judgment for the plaintiff for $3,083,732.64. It is so ordered.
Sinnott, Judge; Geeen, Judge; Moss, Judge; and Gka-ham, Judge, concur.