Booth, Olvief Justice,
delivered the opinion of the court:
The plaintiff is incorporated under the name of W. S. King & Company, and is engaged in construction and repair *331 work. The office of the corporation is in Philadelphia, Pa. On April 11, 1930, plaintiff and defendant, the latter acting through the Militia Bureau of the War Department, signed a contract obligating the plaintiff to reroof sixty-three buildings at Camp Beauregard, Louisiana, for which it was to receive $8,750. The work was to commence immediately and be completed by June 11, 1930.
The plaintiff at once assembled the materials and laborers required to do the work and commenced performance on time. From the very beginning of performance until the completion of the contract work differences and disputes arose between the plaintiff’s representative and-the representative of the contracting officer on the work, and this case involves said differences and disputes, the plaintiff alleging illegal contractual exactions, which occasioned it expense, and the imposition of extra and additional work which under the contract it was not required to perform. The defendant challenges practically every item claimed, and,, in addition, files a counterclaim.
Item 1. Paragraph 8 of the specifications provided in part as follows
“ 8. Liability itok damages : The contractor will be held responsible for all damage to the work under construction, whether from fire or other causes, during performance and until final completion and acceptance. * * * ”
The contracting officer, construed this as compelling the plaintiff to take out fire-insurance policies upon the group of buildings upon which work was in progress, for and in behalf of the United States. The plaintiff protested but was compelled to yield when faced with a stoppage of all work unless this was done. The insurance was obtained at a cost of $223.15 and the policies were made payable to the United States and retained in the custody of the contracting-officer.
The defendant contests this item upon the theory that the plaintiff having assumed liability for damages caused by fire and being financially irresponsible, the contracting officer was within his contractual rights in exacting the insurance. The defendant says that insurance against fire was as bene *332 ficial to the plaintiff as to the United States. With this latter proposition we have nothing to do: The United States inserted article 8 into the specifications, and the indemnity provided in case of fire was restricted to the plaintiff corporation and the bond executed by it. The United States was willing to accept the contractor’s responsibility without compelling it to provide against the contingency by taking out fire insurance. The principle of law involved is akin to what this court said in Leary Construction Company v. United States, 63 C. Cls. 206, and Pneumatic Gun-Carriage Company v. United States, 36 C. Cls. 71. We think the contracting officer misinterpreted this article of the specifications and the item is allowable. The item is manifestly foreign to a claim for extra work or material under article 5 of the contract.
Item 2 relates to the small sum of $13.50 and is the subject of sharp conflict in the testimony. Article 6 of the contract provided for an inspection of all materials to be used in performing the contract. The roofing material was-to be “ Carey extra heavy roll roofing slate surfaced ‘ las-tile.’ ” The contracting officer required the plaintiff to deliver to him for inspection six full rolls of roofing paper purchased for use under the contract specifications. The plaintiff under protest delivered the paper, and for some unexplained reason the same was never even opened, much less inspected. The plaintiff says the paper was never redelivered to it. The defendant says the plaintiff gave a written order to the contracting officer to deliver the same to plaintiff’s subcontractor, who was placing the roofing. We are unable to find a written order to this effect in the record, and no proof that it has been lost or misplaced. The evidence does show that plaintiff’s subcontractor had possession of the paper and that none of it went upon the roofs of the buildings, the subcontractor retaining it for his own purposes.
The defendant does not disavow the right of the plaintiff to have the paper returned for use by it, and the record establishes that the plaintiff was denied the right to use it. The contracting officer in doing what he did had a con *333 tractual right to exact the delivery of the paper for inspection, bnt clearly he had no contractual right to retain it un-inspected and then dispose of it in the manner proved. The contracting officer’s authority was stated in the contract, and if he chose to enter into the relationship existing between the plaintiff and its subcontractor that was a matter completely outside the terms of the contract. His manifest duty under the facts established was to return the paper to the plaintiff. We can find no competent evidence in the record that the plaintiff authorized the delivery of the paper to its subcontractor. The item will be allowed.
Item 3. In considering this item it will be necessary to set forth the following provisions of the contract and specifications :
“ Aetiole 15. Disputes. — Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the contracting officer or his duly authorized representative, subject to written appeal by the contractor within thirty days to the head of the department concerned, whose decision shall be final and conclusive upon the parties thereto as to such questions of fact. In the meantime the contractor shall diligently proceed with the work as directed.”
“ EemoviNG old ROOKING: The contractor shall remove all old roofing and metal edging and shall clear sheeting of all old roofing nails.”
“ Defective sheeting : Cracked, rotten, and broken sheeting and sheeting having knot holes one (1") inch in diameter or larger shall be considered defective. This sheeting shall be removed and replaced with new sheeting #2 long leaf yellow pine, squared on four sides, or shiplap, depending on whether boards or shiplap was used previously for sheeting on building being covered.”
“Longitudinal cracks: All longitudinal cracks more than one-half (%") inch wide will be closed by removing old sheeting and relaying or replacing with new sheeting so as to close crack.”
“ Length of sheeting : No new or salvaged sheeting less than six (60 feet long will be used.”
It is to be observed that under the specifications the plaintiff was to first remove all of the old roofing in place upon the buildings. The old sheeting upon which the old roof had been nailed was to be removed wherever defective and *334 replaced with new sheeting as provided. Old sheeting was to be classified as defective whenever it fell within the provisions set forth in the specifications. Fifteen of the buildings were erected in 1917 and were known as the “ wartime group.” The roofs on all these buildings were in bad condition. The remaining 48 were constructed in 1926 and the roofs were not so dilapidated. ■
The plaintiff removed the roofs from the first group of buildings upon which it was allowed to work and proceeded to replace and repair the sheeting as was thought to be in accord with the specifications. Subsequent to the completion of most if not all of this repair and replacement work, the contracting officer upon inspection thereof determined that in many respects the specifications had not been complied with as to sheeting. In reaching this conclusion he construed “ cracked sheeting ” to be any boards which disclosed cracks in them, irrespective of how the cracks originated. He took no account of what is known as “ seasoning cracks ”, which admittedly do not impair the strength of the lumber and occur generally in most all grades of the same.
In company with the representatives of the plaintiff and his own representative upon the work, the contracting officer, standing on the floor or on a table, either removed or directed the removal of a considerable portion of the sheeting by the use of a 2' x 4' piece of timber. The alleged defective sheeting was forcibly loosened from the rafters of the building in the manner noted, and the plaintiff directed to replace all of the same. The plaintiff proves a protest; the defendant counters with proof that the procedure adopted was agreeable to the plaintiff and that its representative participated therein.- It has been difficult to reconcile the record. It is indisputably - evident that the plaintiff was dissatisfied with the construction placed upon what is cracked sheeting under the specifications, and the condemnation of such a large quantity of sheeting already in place, and a protest must have been made. We say this because the plaintiff’s representative and the contracting officer agreed to arbitrate the dispute and agreed upon the contracting officer’s own attorney as the arbitrator. Surely this would not have occurred if no acute differences existed.
*335 The chosen arbitrator investigated the matter, heard the parties, and decided that the contracting officer was wrong in his construction as to what constituted cracked sheeting, and that the plaintiff was right. Thereafter as to sheeting placed, the contracting officer observed the decision of the arbitrator. Sheeting had been condemned as defective upon eight or nine buildings and replaced by the plaintiff before the contracting officer received the decision of the arbitrator, and it is for the value of the materials used and labor cost incurred in replacing the same that judgment is asked.
The contracting officer admits that the existence of knot holes in the sheeting is an inconsequential item, but does contend that in many instances an inferior grade of sheeting was used in repair work, and what was used was not of the required length. There is no evidence in the record that indicates a wholesale use of inferior' sheeting not up to grade. The testimony upon this subject is quite indefinite and uncertain as to the quantity alleged to have been used, and it is apparently admitted that most of the new lumber used was in accord with the grade specified.
Article 6 of the contract covers in four separate paragraphs the matter of inspection of materials and workmanship. It is not shown that the lumber complained of failed to pass inspection at the place of manufacture. Nothing appears of record disclosing any adverse inspection of lumber at the site of the work where it was available for the same. The inspection was delayed until it was in place, and while authority perhaps obtained to so inspect it, it is difficult to reconcile a proceeding which allows a contractor to proceed with defective materials within the presence and under the daily inspection of a representative of the contracting officer until the work involving the use thereof is practically, if not wholly, completed.
Paragraph (d) of article 6 reads as follows:
“ Inspection of material and finished articles to be incorporated in the work at the site shall be made at the place of production, manufacture, or shipment, whenever the quantity justifies it, unless otherwise stated in the specifications; and such inspection and acceptance, unless otherwise stated in the specifications, shall be final, except as regards latent defects, *336 departures from specific requirements of the contract and the specifications and drawings made a part thereof, damage or loss in transit, fraud, or such gross mistakes as amount to fraud. Subject to the requirements contained in the preceding sentence, the inspection of material and workmanship for final acceptance as a whole or in part shall be made at the site.”
This paragraph, we think, contemplates precisely what the plaintiff did with respect to the lumber. The manufacturers were ordered to supply lumber which met the specifications; the lumber was supplied, received at the site of the work, open to view, and no complaint as to it made before user, although one witness says that as much as approximately sixty percent of the same was of an inferior grade. It seems inconceivable that the contracting officer could have been imposed upon to this alarming extent without stopping the work entirely.
The defendant contends that the plaintiff cannot recover because it did not adopt the procedure set forth in article 15 of the contract (page 5).
We can see no necessity for the plaintiff resorting to article 15. The contracting officer reversed his decision with respect to what constituted cracked sheeting, and by thereafter adhering to the decision of the arbitrator admitted that the plaintiff was not at fault. Why should the plaintiff appeal from a ruling in its favor ?■ The right of appeal was’ granted to correct an adverse ruling.
The contract imposed upon the contracting officer the duty of, in the first instance, deciding disputed facts, and this he did. His final determination was that the sheeting to be used would not be condemned for seasoning cracks, and, if this is so, the sheeting previously condemned was wrongly held defective, and the plaintiff suffered a loss to this extent.
In the case of Yale & Towne Mfg. Co. v. United States, 58 C. Cls. 633, 638, this court said:
“ Provisions in Government contracts reposing in some designated official the right to determine certain questions and making his determination thereof conclusive are of frequent occurrence. Such provisions are inserted largely for the protection of the Government, and the cases in which such a determination by the designated official has been upheld by the courts have been largely cases in which the rule has been *337 invoked in favor of the United States and against the plaintiff, but the rule is none the less effective if perchance it occasionally may operate the other way.”
The effect of what the contracting officer did was to give heed to plaintiff’s protest, consider the facts, submit them to an arbitrator, and then accept as his ruling what was the final-determination. It is true the contract made no provision for arbitration, and we do not rely upon the arbitrator’s decision. It is the contracting officer’s decision which prevails, irrespective of the mode adopted to reach it, so long as it is free from fraud.
The loss suffered by the plaintiff on account of the rejection of sheeting as defective which was not so, is said by the plaintiff to extend to 24,000 feet of lumber. That it was extensive is proved, for the contracting officer’s representative testified that in using the 2' x 4' timber to detach the condemned boards they frequently split and loosened a good board, in which case he condemned both the old and the new board, a proceeding which increased plaintiff’s loss. The plaintiff was not required to place sheeting over the entire dimensions of the roofs. The undertaking required only repair and replacement work. The war-time group of buildings exacted a considerable quantity of lumber. This is not denied. While the record does not establish with indisputable accuracy the quantity of lumber lost to the plaintiff, we think the quantity claimed falls at least within the minimum amount. It was not expensive lumber and was not intended to be, and the manner of condemning it, together with the apparent lack of knowledge as to its classification, undoubtedly resulted in the contracting officer deciding in every instance antagonistically to the plaintiff.
In the case of Electric Boast Company v. United States, 66 C. Cls. 333, 375, this court said:
“We think the settled rule as to damages is that they are not to be denied because they may not be susceptible to indisputable accuracy. The test to be applied is, Have the sums claimed been calculated upon a reasonable basis, and under all the circumstances of the case does the claimed amount reflect the proximate injury? If the element of speculation is absent, if the basis of computation is the usual and customary one followed in cases of a similar character., *338 and the court is satisfied that the method of computation employed reflects with reasonable certainty the extent of the loss, judgment may be predicated upon this basis. Especially is this true where the loss was occasioned by. some act of the defendant. Eastman Kodak Co. of New York v. Southern Photo Materials Co., 273 U. S. 359, 378.”
, Taking into consideration the area of the roofs of the buildings to be repaired, and the percentage of repair exacted, we think the plaintiff is entitled to a. judgment for this item of $1,162.22.
Item 4. The contracting officer concluded that he would salvage the roofing to be removed from six buildings and set one man to work removing the same. It was removed by the workman cutting the roofing about eight inches distant from the point on each side where it had been nailed to the sheeting, and then rolling off the roof the quantity thus loosened, leaving the eight-inch strips nailed down. Manifestly this process did not facilitate plaintiff’s work, for all the nailed portion had to be detached and removed by the plaintiff. .
The specifications required the contractor to “ remove all old roofing”; no exceptions were made. All old roofing-was to be removed, and the contracting officer by projecting this one, workman into the contract work did so without contractual authority. There is no evidence in the record that the plaintiff declined to remove the roofing, and nothing to indicate that what was done inured to any great profit for the United States. Whatever else may be said, it is certain that the plaintiff had to place its laborers upon the roof and remove the roofing left thereon by the defendant’s workman, and that in doing so it was denied the right to expedite the work which attended the removal of the roofing without severing it into strips.
The defendant contends that it neither increased the expense nor prolonged the time of performance of the work by what the contracting officer did, that other buildings were available to the plaintiff to work upon, and the same process was employed to remove the strips that was employed to remove the roofing in its placed position. While we do not accede to the defense interposed, we cannot include the item *339 in the judgment to be awarded because the record does not disclose any basis other than a speculative one as to the extent of the damages suffered. The plaintiff did have other buildings upon which the work could be and was proceeding, and we cannot discover in the record any positive proof that what was done delayed the performance of the work.
Item: 5. This item is governed by paragraph 6 of the specifications, which reads as follows:
“ 6. Laving out of wokk : The contractor must lay out his own work; he shall be responsible for measurements; he must exercise proper precautions to verify the figures before laying out the work, and will be held responsible for any errors therein that otherwise might have been avoided. He shall promptly inform the contracting officer of any errors or discrepancies he may discover in the specifications, in order that the proper corrections may be made and understood. The work must be carried on systematically, and so managed at all times as to secure rapid progress and avoid annoyance and inconvenience.”
The plaintiff intended to follow an order of work embracing the employment of some sixty men, and proceed by first removing all the old roofs from the buildings, then follow this by repairing and replacing the worn-out sheeting, and then in order reroof the buildings. The contracting officer objected to this procedure and would not assent to it. The reasons assigned were that to unroof so many buildings at one time and expose the interior to possible rains and storms was neither wise nor contemplated by the specifications, and he then notified the plaintiff that the buildings must be grouped into units of six or eight and the work completed in this way before proceeding to unroof another group.
The specifications state that the work was to be carried on systematically so as to avoid annoyance and inconvenience. What was systematic is a question to be solved. Obviously a system which would result in unroofing a large number of buildings in the spring of the year and leave many of them exposed to the uncertainties of weather conditions, while perhaps conducive to expeditious performance of the work, was not a system calculated to effectually preclude annoyance and inconvenience, as well as possible damage to the structures. The specification relied upon did not give to *340 the plaintiff an absolute right to lay out the work, if in the judgment of the contracting officer the system adopted would jeopardize the property of the United States. The item cannot be allowed.
Item 6. Article 16 of the contract upon the subject of payments to be made for the work is as follows :
“Akticle 16. Upon completion and acceptance of all work required hereunder, the amount due the contractor under this contract will be paid upon the presentation of a properly executed and duly certified voucher thereof, after the contractor shall have furnished the Government with a release, if required, of all claims against the Government arising under and by virtue of this contract, other than such claims, if any, as may be specifically excepted by the contractor from the operation of the release in stated amounts to be set forth therein.”
Paragraph 12 of the specifications also provides that “ Partial payments will not be made, but payment in full will be made upon completion and acceptance of the work, and upon presentation to the contracting officer of satisfactory evidence that all obligations of the contractor against this contract have been paid in full.”
The plaintiff' completed performance of the contract on May 28, 1930, i. e., fourteen days prior to the expiration of the time limit to complete. The contract work was inspected and approved May 29,1980, but the plaintiff did not receive payment therefor until July 28, 1930, almost two months later. For some unexplained reason, the contracting officer assumed jurisdiction over the payment of any money due the plaintiff, and he withheld payment upon the theory that the plaintiff must satisfy him that all sums due material men, etc., had been paid, and the statement of the plaintiff that a claim against the Government would be prosecuted, and continued to withhold payment until advised, as he states, by the War Department that he “ had no business doing this.” Upon receipt of this information and after protests by the plaintiff, involving six trips from Philadelphia to Washington, as well as the added expense of retaining workmen on the job for many days after its completion, plaintiff finally received payment.
*341 This extraordinary proceeding is defended on the ground ■that the provisions of the contract authorized it. The words cited to sustain the defense are “ that all obligations of the contractor against this contract have been paid in full.” In other words, the contention resolves itself into an assertion that the contracting officer as a representative of the United States is also a representative of the plaintiff’s creditors. The argument is decidedly anomalous. The creditors of the plaintiff possessed no lien upon the property of the United States, and subcontractors were protected to some extent by the act of February 24, 1905 (33 Stat. 811), if the same was -complied with, but, as the act of February 24, 1905, clearly expresses, all rights of subcontractors are subordinate to the prior rights of the United States. The plaintiff executed a bond for the faithful performance of the contract and otherwise fulfilled its obligations thereunder. The withholding of the sum due was without authority, either under the terms of the contract or existing law.
The loss suffered by the plaintiff because of this proceeding is ascribable to an erroneous construction of the contract terms. Payment was not withheld accompanied by a willful intent to embarrass the plaintiff. The defendant withheld it under the contract, and by so doing caused this plaintiff to expend $250 in order to collect it. If the contract terms as to payment had been observed by the defendant, the above sum would have been saved to the plaintiff. We think this sum should be included in the judgment.
DEFENDANT’S COUNTERCLAIM
To offset whatever judgment the plaintiff is entitled to recover, the defendant interposes a counterclaim of $632. The same is predicated upon paragraph two of article 1 of the -contract, which reads as follows:
“ The roofing material to be used to be Carey extra heavy roll roofing slate surfaced ‘ lastile ’ and to be guaranteed by the contractor for a period of five (5) years. Contractor to •furnish guarantee bond covering five-year guarantee.”
Two years after the plaintiff’s contract work had been inspected, approved, and paid for, some leaks were discovered in the roofs of some of the buildings, and an official of the *342 United States, after examination, solicited, without competition or public advertisement, a bid from the plaintiff’s subcontractor, who had, himself, placed the roofing on the buildings, to repair the same. The bidder offered to do the work for $632, but the record fails to disclose that his bid was accepted or that the United States has ever incurred or paid to anyone the sum of $632 to repair the roofs. Aside from additional facts, as well as the construction of the article of the contract relied upon, we think what has been said is sufficient to warrant us in dismissing the counterclaim. The last finding of the court discloses the situation.
Judgment will be awarded the plaintiff in the sum of $1,648.87. It is so ordered.
Whaley, Judge; Williams, Judge; Littleton, Judge; and GREEN, Judge, concur.