Littleton, Judge,
delivered the opinion of the court:
June 27, 1986, the defendant, acting by and through the United States Engineer Corps, U. S. Army, War Department, issued through certain officers at Honolulu, T. H., an invitation for bids accompanied by a standard printed contract form and detailed specifications prepared by defendant for the rental of tunnel shovels, to be operated by the contractor, and mine cars of a specified capacity, to be operated or trammed by defendant, together with associated equipment, such as tracks, etc., for use in connection with the project outlined in finding 1.
Plaintiff, James Garfield Needles, submitted a bid for rental on an hourly basis of two 80 hp. standard tunnel shovels, mine cars for hauling the excavated material out of the tunnels, and all other necessary equipment. Plaintiff prepared and submitted to the contracting officer through his authorized representative, who wrote the specifications, a *581 blue print of a drawing showing the design and size of the mine cars to be made and furnished, and this drawing was examined, appro^d, and retained by the Government. Thereafter plaintiff constructed the mine cars in accordance with this drawing. Plaintiff was the only bidder, and his bid for rental of this equipment at an hourly rate of $13.10 was accepted. He was notified by the contracting officer of such acceptance on July IT, 1936, and this notice was received by plaintiff on July 21.
The bid form furnished by defendant required plaintiff to state the number of calendar days! after date of receipt of notice of award of the contract within which he would be “ready to operate at full capacity under the provisions of the attached specifications,” and plaintiff stated in his bid that he would be operating at full capacity within 32 calendar days after receipt of notice of award. The defendant’s notice of award and Article 1 of the contract fixed the period of 32 calendar days after July 21, 1936, within which plaintiff should have the equipment operating at full capacity, as contemplated by the specifications. Under the contract plaintiff was entitled, with the consent of defendant, to commence operations at any time after July 21, 1936, the date of the contract and date of receipt of notice, but plaintiff had until August 22, 1936, within which to get the shovels and associated equipment, such as mine cars, tracks, turntables, etc., operating at full capacity. He commenced operations with the consent of the contracting officer on August 15, 1936.
The evidence in this case shows without contradiction that it is recognized and understood by everyone that in a project of the character here involved it takes several days from the time operations are first commenced to get all the equipment and the organization engaged in operating and handling it in smooth working order and operating at normal and full capacity.
A few days prior to Saturday, August 15, 1936, the defendant had blasted certain material at the portal of a certain gallery or tunnel, and on Friday, August 14, with the consent of the Government, plaintiff arranged to commence operating one of the tunnel shovels and the mine cars for receiving and *582 hauling away the excavated material on Saturday, August 15, at 3 p. m. At that time the second tunnel shovel, or mucking machine, had not been completely assembled, and the operation of the second shovel was to commence on Monday morning, August 17. As shown in the findings and by the provisions of the contract quoted therein plaintiff was to furnish the equipment described and the operators for the shovels, and defendant was to do all the work of drilling and blasting, and the handling, tramming, and dumping of the mine cars as loaded by the shovels.
Sometime before 8 a. m., August 15, plaintiff instructed his men that operations with one of the shovels would commence that afternoon at three o’clock, whereupon he went to Honolulu, a distance of about three or four miles, on business. While plaintiff was absent defendant’s contracting officer came to the site of the work about 8 a. m. and remained there not more than half an hour. During the time he was there the tunnel shovel was not operated, but some mine cars were being loaded with blasted material by hand apparently in a sort of cleaning-up process preparatory to commencing operations with the shovel as had theretofore been planned. During the half-hour the contracting officer was there he observed defendant’s laborers tram and dump one mine car.. It is apparent from the record that during the time the contracting officer was at the site the men on the job did not consider that operations were actually underway. Plaintiff’s superintendent, a man of long experience in tunneling operations and in the operation of tunnel shovels and mine cars of the character to be used on this project as called for by the contract, was present while the contracting officer was at the site of the work, but the defendant’s Superintendent, who was to have charge of operations for the Government, was not present. The contracting officer states in his testimony that when this loaded mine car was trammed, dumped, and brought back while he was present the men furnished by defendant for the handling and dumping of mine cars spent nearly fifteen minutes in the operation and that, while he did not go to the point where the car was being dumped, they seemed to him to be having some trouble dumping it, but that he did not examine the car, the dumping arrangement *583 thereon, or the tipple, or inquire of the men as to the trouble they were having, if any, or why it should have taken them several minutes to dump and return the car. Whatever time may have been consumed by defendant’s employees in tramming, dumping, and returning the first loaded mine car was due, as the evidence shows, entirely to the inexperience or slowness of defendant’s men and was not due to any mechanical defect or inefficiency of equipment. Operations were not then under way and the men were familiarizing themselves with the handling of the mine cars, the operation of the dumping arrangement thereon, and the tipple. The evidence shows conclusively that due to their lack of experience it was necessary to proper handling of the cars that they become familiar with these matters. At this point the contracting officer left the site of the work and did not at any time return thereto until long after the use of mine cars had been abandoned, as hereinafter set forth. Soon thereafter the defendant’s superintendent arrived.
The contracting officer, a Lieutenant Colonel in the Engineer Corps, U. S. Army, had had no experience in tunneling operations or in the operation and handling of equipment, including mine cars, such as called for by the contract and furnished by plaintiff. Defendant’s superintendent, a civilian, was also without previous experience in the operation of tunnel shovels or in tramming and dumping of mine cars in tunneling operations. Soon after defendant’s superintendent arrived he started operations with one of the tunnel shovels and mine cars. Plaintiff’s superintendent advised plaintiff at Honolulu by telephone that operations had commenced, and plaintiff returned to the site of the work as soon as he could and arrived there at about 10 a. m.
The evidence of record establishes that all the equipment furnished by plaintiff, including the mine cars, tracks, and tipple, fully conformed to and met all the requirements of the contract and specifications, and was fully capable of operating in accordance with and as contemplated by the specifications as written. When the shovel first started operating on the morning of August 15,1936, as above stated, it was necessary by reason of the track arrangement and layout at the particular point where operations were com *584 menced for the shovel and the mine car attached thereto to operate on a slight curve of the track, but this did not affect the proper operation of the shovel and the mine car under the terms of the contract, and, at most, the condition under which the shovel then operated was only temporary. Plaintiff was not required under contract to operate at full capacity until August 22, 1936. He, therefore, had seven days within which to meet and overcome any preliminary or temporary defects that might be encountered in operation of the equipment. The contract provided for liquidated damages of $200 a day if he did not do so.
The mine cars were of a conventional type and design and in every way conformed to the requirements of the specifications. There is no convincing proof by defendant that the mine cars would have operated better if they had been differently designed and constructed. The mine cars were capable of being easily and speedily trammed from the point of operations to the dumping point and return. They were equipped with a proper, suitable, and easily-workable arrangement or device for permitting one end of the car to be opened and the blasted material loaded in the car to be emptied therefrom at the dumping point, and plaintiff had provided a conventional and suitable dumping arrangement, or tipple, which was strong, practical, workable, and easily operated. The tipple, when operated, inclined not more than 60 degrees, which permitted the mine car to empty its contents and, when the car was so emptied, the tipple automatically returned to normal position. The mine cars each had a capacity of 1%0 cubic yards; they were constructed of strong material, and it is admitted by defendant’s witnesses that the capacity of the mine cars and the material of which they were constructed conformed to the requirements of the specifications. The wheels of the mine cars were 18 or 20 inches in diameter and the body rested on the car axles. The body of the car was at least 2 feet deep, 3 feet 7 inches wide at the top, and 4 feet long. The weight of the car when loaded with the material to be excavated was approximately 800 pounds. A loaded car was capable of being easily and speedily trammed and dumped by one man. The conveyor belt of the tun *585 nel shovel, which operated to carry the excavated material from the shovel or dipper in front of the machine to the rear, was about 22 inches wide.
Prior to the time operations were commenced on August 15 plaintiff had demonstrated and tested the tramming and dumping of loaded mine cars many times. These tests show conclusively that the emptying arrangement of the mine cars, when released by the pulling of a latch pin or bar after the loaded car reached the tipple, and the dumping arrangement at the end of the track worked efficiently, speedily, and properly. The far greater weight of credible evidence of record shows to our entire satisfaction that during the short time the equipment was operated on the morning of August 15' all the equipment and facilities mechanically operated properly and in full compliance with the provisions and requirements of the contract. Several mine cars were loaded by hand in the beginning and some were loaded by the tunnel shovel. However, the proof shows, and this is admitted by defendant’s witnesses, that the Government laborers whose duty it was to tram and dump the cars handled only two; that they were wholly inexperienced in such work and that they had not prior to the morning of August 15 made any effort to familiarize themselves with the handling, tramming, and dumping of the mine cars. The proof also shows that they were not given that opportunity by the Government when operations were commenced. Under the terms of the contract defendant agreed to handle, tram, and dump the mine cars with labor furnished by it. Defendant had five or six laborers to handle the mine cars. The proof further shows that in the handling of each of these cars four or five men took hold of and rushed it to the dumping point. Defendant’s superintendent testified that when he arrived at the site of the work he observed the handling by the men employed by defendant of only one mine car to the dump and return. He stated that as he recollected these men consumed about 10 or 15 minutes in tramming, dumping, and returning the car. He did not at any time examine the emptying arrangement of the car, or the tipple, nor did he at any time make any inquiry of the men or go to the dumping point *586 to ascertain why it took the men a longer time than he thought should be necessary for dumping and returning the car. Neither the contracting officer nor his authorized representative who later came on the job gave any consideration to or made any investigation as to whether the defendant’s force of men was properly or efficiently handling the mine cars. Plaintiff’s proof leaves no doubt that the equipment and facilities furnished by him worked properly and met all requirements of the specifications, and there is no credible evidence to the contrary.
Defendant’s superintendent testified, as hereinafter more fully set forth, that he knew that the mine car crew was inexperienced and that this was the principal reason why they consumed so much time in tramming, dumping, and returning the mine car which he saw them handling; that when he- observed the handling of this car he stopped the work in order to consider the situation and to arrive at a conclusion as to what should be done to overcome the situation resulting from the slowness of the mine car method and the slowness with which the defendant’s force handled the mine cars to the end that the work might be speeded up. He states that he did this for the reason, as it occurred to him, that the use of mine cars would have required in hand-tramming the amount of yardage necessary to be removed in construction of the tunnels called for by the contract a great deal more time than was available under the contract to excavate the tunnels and complete the job. He states that he discussed the matter with his foreman and came to the conclusion that the mine cars should be abandoned and that automobile steel dump trucks of 2 or 8 cubic-yards’ capacity should be substituted therefor and used in place of the mine cars, such trucks to be operated backward and forward, with the movement of the excavating shovels, and under the rear end of the shovel conveyor belt to receive and haul away the excavated material. Thereupon he ordered that the mine cars be discarded, that trucks be substituted, and that the work proceed from that time forward by the use of trucks, instead of mine cars. As set forth in the findings, these trucks severely collided with and seriously damaged the shovels and their operating *587 parts and mechanism to such an extent that at the end of the work the shovels were valueless, except for junk. This damage to the shovels also resulted in great expense to plaintiff for repairs and for additional parts. These trucks also operated over or across the tracks necessary for the operation and movement of the tunnel shovels, and defendant also operated caterpillar tractors and bulldozers over and upon the tracks which also damaged the tracks, and this was primarily, if not wholly, responsible for delay in actual mucking operations, including the delay due to breakdoAvns and repairs, for 417 hours and 32 minutes, for which time plaintiff was not paid rental and for which he was penalized in addition. The lost rental and penalties amounted to $5,511.74, which was deducted by defendant from the amount of rental which would otherwise have been due under the contract.
All the actions taken by defendant’s superintendent, as hereinbefore set forth, and the reasons for which he took such actions were known to the contracting officer’s authorized representative in charge of the work and to the contracting officer personally, and such actions were all approved by them over plaintiff’s protests for the same reasons that prompted defendant’s superintendent to take the action mentioned. The actions and decisions of the contracting officer were unjustified and unauthorized on the facts which were known to him and the terms and conditions of the contract, and constituted a breach of the contract. His decisions were adhered to in disregard of the true facts and the rights of plaintiff under the contract, notwithstanding vigorous protest by plaintiff when he arrived on the job and continuously thereafter until he abandoned the work early in October, as hereinafter set forth. The proof shows that these actions and decisions of the contracting officer were arbitrary and were not made in good faith. The proof further shows that upon the facts which existed, which were known by and available to the contracting officer and which should have been considered and given weight by him, the decisions made were under the terms of the contract so grossly erroneous as to imply bad faith.
Plaintiff arrived at the site of the work a short time after *588 defendant’s superintendent had started operations and had ordered that the use of mine cars be discontinued and that trucks be substituted therefor. He immediately observed that the mine cars were not being used; that, instead, large trucks were being used; that there were several loaded mine cars standing on the track; and that a truck being operated with the shovels was standing at an angle under the rear of the tunnel-shovel conveyor and had torn the conveyor belt for about eight feet. Plaintiff immediately called his men off the job and ordered all operations stopped. He vigorously protested to defendant’s superintendent, advising him in effect that the use of trucks was a violation and a destruction of the contract; that the Government had no right to discard the mine cars; that the mine cars conformed in every way to the requirements of the contract and that he could not carry on operations in accordance with the contract if trucks were used in lieu of mine cars; that substitution of trucks constituted a breach of the contract, and that the use of trucks would damage his shovels because they were not designed nor intended to be operated with trucks but were especially designed and constructed to be operated only with the particular mine cars provided and called for under the contract; and that the rental arrangement provided for in the contract could not be applicable to the operation of shovels with the trucks. Plaintiff later made the same protest to the contracting officer, without avail. When plaintiff arrived at the site he asked defendant’s superintendent what the trouble was and why he had discarded the mine cars. The superintendent told plaintiff that the mine cars didn’t work because they were too slow, and that the men, whose duty it was to handle them, consumed too much time in tramming and dumping the mine cars. In reply to this statement plaintiff stated to the superintendent that the mine cars conformed to the contract and that he would demonstrate that the mine cars did work properly and that they could be easily and speedily trammed and dumped. Thereupon plaintiff, although he was a man 65 years of age and suffered from heart disease, took hold of one of the loaded mine cars standing on the track nearby and, without assistance, trammed it to the turntable, revolved the turntable, trammed the car to the dumping point on to *589 the tipple, released the end gate of the car, tilted the tipple, emptied the car and returned it to the point of origin without any difficulty whatsoever and in a very short time. In this operation the track, the mine car, and the tipple worked perfectly. When plaintiff had returned the empty car he stated to the superintendent that there was nothing wrong with the cars or the dumping arrangement thereof, or with the tipple, and that all that was necessary in handling, tramming and dumping of mine cars w'as to handle them normally and with a little discretion. He further told the superintendent that everyone on the job, except the operators of the tunnel shovels, was new and inexperienced, and that all that-was necessary was for the Government laborers handling, tramming, and dumping the mine cars to be shown or instructed how to handle and dump them. At this point Cap-' tain Hill, the authorized representative of the contracting officer, arrived. Captain Hill had been specifically authorized by the contracting officer to have complete charge for him of the work and the operation of the equipment, and to act for him in all matters with respect thereto, except the matter of making final decisions, which he, the contracting officer, was required under the contract to make. Plaintiff stated to Captain Hill that the mine cars worked perfectly and that the Government did not have the right under the contract to use the trucks in place of mine cars and that he, the plaintiff, would not stand for this. Thereupon Captain Hill threatened to incarcerate plaintiff in the guard house on the military reservation if he interfered with continuance of the work with the trucks — the work at that time being at a standstill— and Captain Hill ordered the men back on the job and ordered that the work proceed with the use of the trucks. Captain Hill did not at that time or at any other time make any objection to the use of the mine cars on the ground that they were mechanically defective or inadequate under the contract for the purposes intended, or that they did not work properly and efficiently when properly handled. His sole objection was that the mine cars were too slow and he stated for that reason the Government was not going to use them. Plaintiff later further protested to Captain Hill about the violation of the contract through use of trucks, insisting that their use should *590 be discontinued, and pointed out to Captain Hill his rights under the contract. In reply he was told that the Government could do whatever it desired in respect to the use of mine cars and that plaintiif did not have any rights under the contract in that regard. Shortly thereafter plaintiif went to the contracting officer and protested to him, as he had to defendant’s superintendent and to Captain Hill. The contracting officer, with full knowledge of the facts in connection with the matter as hereinbefore set forth, approved the actions and decision of his representative and declined to consider or give weight to the true facts and conditions stated by plaintiif in his protest. The contracting officer told plaintiif that he had the right under the contract to do what had been done and that he would not use the one cubic-yard mine cars, but would use the 2 cubic-yard trucks instead because the mine cars were too slow; that the use of trucks was to the advantage of the Government and the work, and that speed was essential as it was necessary that the work be completed at the earliest possible date. From that time forward, until he abandoned the contract early in October by reason of these and further breaches of the contract by defendant, plaintiif continuously protested to the contracting officer with reference to the use of trucks and of the caterpillar tractors and bulldozers in the tunnel. Plaintiff did not at any time acquiesce in or consent to the actions of the contracting officer in using trucks instead of mine cars, or in the use of the caterpillar tractors and bulldozers in connection with tunneling operations.
Thereafter the work continued under orders of the contracting officer, but under the protest of plaintiff, until about October 2d'when defendant again breached the contract in another respect by insisting upon the right under the contract to use a third 60 hp. tunnel shovel without compensation or rental to plaintiff therefor. When the matter of the use of a third shovel was first mentioned to plaintiff by the contracting officer, plaintiff objected to use thereof on the work, but the contracting officer asked plaintiff to submit to him a proposal setting forth the terms and conditions under which he would be willing to permit use of the third shovel. Plaintiff submitted a proposal (quoted, in finding 36) but the contracting officer refused and rejected *591 it, and told plaintiff on October 2 to place the third shovel in operation on the work under the contract in addition to the two 30 hp. shovels called for by the contract, and further told plaintiff that he, the contracting officer, had the right under the contract to require this to be done without payment of additional rental. Plaintiff refused to do this and protested to the contracting officer that use of the third shovel would be a violation of the terms of the contract. In reply the contracting officer stated that the third shovel would be placed in operation on the job by the Government and operated with plaintiff’s employees and attendant equipment. The contracting officer brought the third shovel on the job between October 2 and 4. Plaintiff became ill and was taken to the hospital on October 5, and on October 7 he wrote the contracting officer notifying him that due to operating conditions, which included the asserted right to use the third shovel, imposed upon him in violation of the terms of the contract, he found it impossible for him to continue to perform the contract. On October 9 the contracting officer replied that the Government would not release plaintiff from performance under the contract.
The 60 hp. shovel with a number of two cubic-yard standard Koppel mine cars had been brought to the site as a protection to plaintiff against unforeseen contingencies or breakdowns and for possible use by defendant, if it desired to operate the same on this or other work under satisfactory arrangements with plaintiff. When the contracting officer had completed arrangements, including the laying of track owned by plaintiff, for operation of the additional 60 hp. shovel he placed it in operation on the job on October 13, without compensation. On October 14, 1936, the contracting officer, after having received plaintiff’s letter of October 7 stating his abandonment of the contract, wrote plaintiff a letter in which he stated that “It is hereby decided by the Contracting Officer that the equipment furnished by you under the above-named contract is unsuitable because of a lack of an adequate supply of spare parts to keep said equipment in operating condition.” The contracting officer further stated in this letter that it was his decision to keep the contract in full force; to condemn as un *592 suitable all parts of said equipment which required replacement in order to perform the work required, and to replace same with suitable parts and charge the extra cost thereof to the contractor as a charge against the rental due under the contract. In reply to this letter plaintiff wrote the contracting officer on October 21 setting forth the grounds on which he had abandoned the contract on October 7, one of which was the decision and order of the contracting-officer that the third 60 hp. shovel be placed on the work. In reply to this letter from plaintiff, the contracting officer on October 24 wrote plaintiff the letter set forth in finding 46. The statements made by the contracting officer in the second and third sentences and in paragraphs numbered 1 to 7, inclusive, were not true and the statements made by the contracting officer in the first, fourth, fifth and last sentences of this letter were not proper interpretations of the contract.
Plaintiff’s funds, including some supplied by his bonding company while he was in the hospital, were used by plaintiff’s employees to pay wages and cost of operations to and including October 15. No further expenditures were made therefor on plaintiff’s account. On October 16 plaintiff had refused to accept from the Government any further payment offered on account of the contract for any woi’k in connection therewith after October 1, 1936. The contracting officer elected to continue the contract in full force and to operate the equipment as before, including the third shovel, paid all costs of operation, including repairs, extra parts and wages, and charged same to plaintiff as a deduction from the amount otherwise due him at the rental rate of $13.10 an hour. After the work had been completed on January 7, 1937, by defendant, plaintiff was offered the amount of $926.17, not including the retained percentage, as the balance due under the contract, which plaintiff refused to accept. Plaintiff was still ill in the hospital when defendant took over the work.
Upon the facts set forth in the findings and the foregoing discussion of the evidence, the issues presented are (1) Did the defendant breach the rental contract with plaintiff for the use and operation of tunnel shovels and mine cars for *593 removal of the blasted, material from the galleries or tunnels'? (2) Under the language of the contract, which includes the specifications, all of which were written by defendant, was the decision of the contracting officer final with respect to matters concerning which he made decisions, and which are claimed to have constituted breaches of the contract, or was the final decision contemplated by the contract with reference to the matters involved to be made by the head of the department? And was the plaintiff required, as a condition to his right to sue for damages, to appeal the particular actions and decisions made by the contracting-officer to the head of the Department? (3) Were the actions taken and the rulings made by the contracting officer consistent with good faith or were they arbitrary or so grossly erroneous as to imply bad faith? (4) Does plaintiff’s petition set forth sufficient facts and allegations to entitle him to relief by way of damages for breach of contract? And (5) The measure of damages and the amount thereof.
We are of opinion that upon the facts clearly established by the greater weight of the credible evidence of record, these questions must be decided in favor of plaintiff.
As to the first question there can be no doubt from the evidence that defendant breached the contract. The first breach was the result of the arbitrary and grossly erroneous action of the contracting officer in substituting trucks for the hand-tranuned mine cars called for by the contract and the unnecessary and unauthorized use of the caterpillar tractors and bulldozers in tunneling operations. The proof convinces us that in taking this action the contracting officer could not under the facts and relevant data, and the terms of the contract, have reached the conclusion which he did if he had acted in good faith and with due regard to the rights of both parties to the contract. His action was contrary to all the existing facts, conditions, and relevant data known to him and available for his consideration and, also, was contrary to the provisions of the contract.
The second breach occurred on October 2, 1936, when the contracting officer, after rejecting plaintiff’s proposal made at his request, told plaintiff to place the third shovel in operation on the work under the contract, notwithstanding *594 plaintiff’s claim that the Government did not have the right under the terms of the contract to use the third shovel without satisfactory arrangement as to adequate compensation therefor. This decision of the contracting officer certainly did not involve any question of fact. It was an unauthorized decision and, therefore, not final. His decision was based upon his interpretation of the contract that the Government had the right to operate the third shovel on the work in addition to the two other shovels without additional compensation. His real reason for taking this action was to enable the Government to complete the work sooner than it could be completed with the two shovels and at less expense.
Plaintiff had the clear right to abandon the contract on account of defendant’s breaches thereof, and this the plaintiff did on October 1. The contracting officer’s attempt to declare plaintiff in default for failure to cooperate; to declare the equipment unsuitable; to keep the contract in full force and effect; to replace alleged unsuitable parts of the equipment, and to charge all cost of performance and of materials to the contractor was without legal effect as against the rights of plaintiff because the contracting officer did not have the right on the facts and under the terms of the contract to do this without assuming the consequences, by way of damages, of such action.
The next question relates to the finality of the actions or decisions of the contracting officer, or of his representative in charge of the work, which were expressly ratified and approved by him.
We have found as a fact from the evidence of record that the actions and decisions of the contracting officer were not made in good faith, and that upon the existing facts, conditions, relevant data, and the terms and conditions of the contract those actions and decisions were unauthorized, arbitrary, and so grossly erroneous as to imply bad faith. While the testimony submitted by plaintiff and by defendant is conflicting in certain respects, it can be reconciled in certain particulars on the evidence as a whole. In certain other respects the testimony of defendant’s witness is not convincing. The far greater weight of credible evidence *595 of record clearly supports the findings made. Some attempt was made in the testimony of certain of defendant’s witnesses, particularly in that of the contracting officer and his authorized representative, Captain Hill, to give some justification for their actions, but this testimony is not convincing, and it is apparent, when all other facts disclosed by the record are considered, that this testimony of these witnesses does not support the action taken and is not entitled to be given weight. The testimony submitted by defendant fails to show that the contracting officer acted in good faith in the actions which he approved or which he took. The far greater weight of credible evidence clearly supports plaintiff’s claim that the equipment furnished under the contract met all the requirements thereof; that it was sufficient, adequate, and suitable to perform the work at a rate of production which was possible under the terms of the contract and the conditions existing in connection with the work; that the equipment and associated facilities operated properly and efficiently, and that there were no mechanical defects therein. The contracting officer and his authorized representative, whose actions he approved, seemed to take the position in their testimony that although the mine cars met the requirements of the contract as to capacity and were not mechanically defective they were not satisfactory to the contracting officer because they were “too slow” and that, for this reason, he had the right under his interpretation of paragraphs 10 (b), 14, and 15 of the specifications to discard them and to substitute the use of trucks therefor having a capacity of twice that of the mine cars in order to speed up the work. However, as hereinafter stated, plaintiff had not agreed to complete the work within any stated period of time. He had made no stipulation as to how long it would take defendant’s force to tram and dump a car, and he had not agreed as to any particular rate of production. He stipulated only that he would furnish a •sufficient number of cars so that there would not be more than a one-minute delay in changing the cars. He did this. Paragraph 10 (b) of the specifications specified that the mine cars to be furnished should be of a capacity of between 1 and 1 y2 cubic yards each; and it further specified that *596 these cars were to be hand-trammed by labor furnished by the Government. This paragraph concluded with the provision that “Cars shall be fitted with suitable roller-type wheel bearings, or equal non-friction type, and shall be capable of dumping in a manner satisfactory to the contracting officer.” The cars were clearly capable of dumping in a satisfactory manner and the contracting officer did not make any finding to the contrary. It seems clear to us that under this provision of the contract, when considered in the light of other provisions thereof, the contracting officer was not entitled arbitrarily or capriciously to declare that the mine cars did not dump in a satisfactory manner. Saalfield v. United States, 246 U. S. 610, 613. The contracting officer did not find, or attempt to find, that the mine cars were not capable of dumping in a satisfactory manner under the provisions of the contract because he never made any investigation or inquiry into the dumping arrangement of the cars or of the tipple, or the actual manner in which they operated when dumping'. The true facts, which conclusively established the contrary, were supplied by plaintiff by a demonstration at the time and in his protests, but the contracting officer refused to consider such facts or to give weight thereto. What he did, as is shown by his testimony, was to discard the use of mine cars mainly because the inexperienced Government laborers consumed too much time in tramming and dumping the two mine cars which they handled on the morning of the 15th, and partly because of their size and inherent slowness. In other words, the basis of his action was his interpretation of the contract to the effect that it gave him the right to do whatever he deemed necessary, notwithstanding the additional cost to plaintiff, to speed up the work. But it seems clear that he was limited in this by the terms of the contract. Chicago and Northwestern Ry. Co. v. United States, 104 U. S. 681, 685.
The proof shows that the contracting officer did not at any time state to plaintiff that the cars were not capable of dumping in a satisfactory manner but stated only that operations, by their use, were too slow and that too much time was consumed by laborers handling the mine cars to permit the work to be completed within the seven-months’ *597 time which had been estimated by defendant for removal of 65,000 cubic yards. Since the Government assumed the obligation of handling and tramming the mine cars, plaintiff was not responsible for the slowness with which his laborers handled them. Paragraph 10 (b) (3) of the specifications expressly so pi'ovided. Neither was plaintiff responsible for the inherent slowness of the mine-car method of operations. What the contracting officer actually did was to double the capacity of the equipment called for by the contract at the expense of the contractor.
Paragraphs 2, 3, and 4 of the specifications, quoted in finding 4, after setting forth that the duration of the work was dependent upon conditions not directly connected with operation of the equipment called for by the contract and could not be guaranteed, stated certain figures as to defendant’s estimate, from which it appears that defendant estimated a rate of pi’oduction with the mine cars of about 18 cubic yards an hour. This rate of production would probably have been about normal for mine cars of 1% cubic yards each. But the contract permitted mine cars of the capacity furnished. Plaintiff did not stipulate nor .agree in the contract that the equipment called for by the contract and specifications would under the operating conditions existing and to be encountered produce 18 cubic yards an hour for 21 hours a day and 25 days a month. Even if he had so agreed the work of excavating the 130 galleries and one tunnel could not have been completed in seven months. The proof establishes without contradiction that the contract terms were such as to disclose to anyone experienced in tunneling operations that with the equipment called for, particularly the hand-tramming of mine cars of about one cubic-yard capacity to be operated in the manner specified and under the conditions to be encountered, the production rate possible under the contract in such conditions would be about 14 cubic yards an hour. The proof shows, also, that plaintiff so estimated the work and computed his bid of $13.10 an hour accordingly. The proof further shows that this interpretation of the specifications and the estimate of the rate of production possible thereunder were entirely reasonable and proper. Plaintiff agreed merely to rent *598 .equipment meeting the requirements of the specifications, including two shovels each capable of excavating and loading at a rate of not less than 20 cubic yards an hour while actually operating at the face, and mine cars meeting the requirements of the specifications, and to operate the shovels at a specified rental for seven months, or until June 80,1937, at the election of defendant. The proof shows and defendant’s witnesses admit that the two 30 hp. shovels called for by the contract were capable of loading more than 20 cubic yards an hour while in actual operation at a face. They actually excavated and loaded at the rate of from 26 to 28 cubic yards an hour. There was no requirement in the contract that plaintiff produce at the mouth of a tunnel any particular number of cubic yards an hour, or day, and it is not claimed by defendant that there was any such i*e-quirement in the contract. The rate of production at the mouth of a tunnel was dependent to a very large extent, in fact almost entirely, upon the way in which the mine cars were handled. All that plaintiff was required to do was to operate the equipment called for by the contract at its full capacity, and the proof shows that he was prepared and able to do this. The proof further shows that had plaintiff been permitted to do this he would have had a production rate of at least 14 cubic yards an hour, provided defendant’s force properly and efficiently handled the mine cars.
Plaintiff was not responsible for delay resulting from the handling of the mine cars under paragraph 10 (b) of the specifications, which provided “That cars shall be trammed by hand by labor furnished by the government; * * * and that a sufficient number of cars shall be furnished to insure Eli at no delay of more than one (1) minute shall occur in the operation of the tunnel shovel as a result of the unavailability of empty cars, provided that such unavailability is due to causes beyond the contractor’s control.”
The defendant’s superintendent in charge of the work, who was the one who made the original arbitrary decision that the mine cars should be abandoned because they were too slow and that trucks be used instead, which decision was soon thereafter approved by the contracting officer, was asked *599 “What was the difficulty with the dumping ?” His testimony was as follows:
A. Well, principally our men were not trained in the dumping of mine cars and we hadn’t made any trial dumps with them before, so we had to examine the dumping arrangements which, on this particular car, was a front-end dump.
*****
Q. Well, after your observation of the difficulty that the men were having with the mine car, what happened ? What did you do,?
A. We used a truck, a two-yard dump truck, under the Conway [shovel].
Q. What prompted you to abandon the use of the mine cars, or did you make that decision ?
A. The decision itself — I don’t remember how we arrived at the decision to use the trucks. It was done simply by putting the truck under there. Whether it was first suggested by one of the foremen, or even possibly one of the workers, I don’t recall. I do know that we ran a truck in under there and loaded it.
Q. Did you make any attempt to estimate how long it would take to complete the contract by the use of mine cars ?
A. No, except that it would be impossible to have hand-trammed the quantity of muck that we had in the time allowed for the job. * * *.
Q. You referred to the use of only one mine car. Was that all that was used? That is, at the very first, or how many attempts did you make to use the mine car %
A. I recall just the one attempt.
Q. Just one car?
A. Yes.
As hereinbefore stated, when plaintiff arrived at the site of the work, soon after the above-mentioned occurrence, he demonstrated in the presence of defendant’s superintendent and all others present the use of the mine cars by, himself, tramming and dumping a loaded mine car and returning it to the point of operation, a total distance of about three hundred feet, in a very short time and without any difficulty whatsoever. The defendant’s superintendent, however, testified that he did not recollect seeing this demonstration of the tramming and dumping of this mine car by plaintiff, but the *600 proof is conclusive that the demonstration was given in Ms presence and immediately following plaintiff’s statement to the superintendent that he would demonstrate with a loaded mine car how easily and efficiently it could be operated. We think defendant’s superintendent did see the demonstration. If he did not it was because he deliberately refused to look. Clearly the contracting officer had no right under the contract to deny plaintiff the right to use the mine cars and put him to great expense merely because the laborers furnished by the Government did not properly perform their duty or did not work fast enough to suit him, or because the one-cubic-yard mine cars were inherently slow even when properly handled.
The proof shows that neither the defendant’s superintendent nor the contracting officer gave the Government laborers on the work of tramming and dumping the cars the opportunity to become familiar with the handling thereof although the contract expressly allowed for this and plaintiff insisted that such opportunity should be afforded. Government witnesses admit that lack of experience of Government employees was primarily responsible for the action taken. The contracting officer admits in his testimony that the basic reason for his action with reference to the mine cars was that they were too slow. If the Government had allowed its employees an opportunity to become familiar with the handling of the mine cars, the loaded cars could have been trammed, dumped, and returned by them easily and speedily without any difficulty or delay.
Under the terms of the contract plaintiff had until August 22, a period of eight days, commencing on August 15, within which to have all the equipment which he was required to furnish under the contract operating properly and at full capacity. This contract right was arbitrarily denied plaintiff by the contracting officer. The record shows without dispute that in an organization and with equipment on a project of the character here involved, it takes several days to get the organization and the equipment working and running smoothly and efficiently.
In connection with the finding of gross error and implied bad faith, the question naturally arises as to what is meant *601 by the term “implied bad faith” in connection with a ruling or decision of a person whose decision is made final under a provision of a contract.
At the outset it should be stated that an officer who is given authority to decide specific matters under a contract or to decide questions of fact, or all disputes arising under a contract, should consider, and is required to consider, and act upon the particular matter or question before him fairly and impartially and “with due regard to the rights of both parties” to the contract. This is made clear beyond doubt by what the court said in its third opinion in the case of Ripley v. United States, 223 U. S. 695, 701, 702, in which the court said:
* * *. No matter how long the delay or how great the damage, he [the contractor] was entitled to no relief unless it appeared that the refusal [of the person authorized to decide] was the result of “fraud or of such gross mistake as would imply a fraud.” Martinsburg & P. R. Co. v. March, 113 U. S. 549; United States v. Mueller, 113 U. S. 153.
But the very extent of the power and the conclusive character of his decision raised a corresponding duty that the agent’s judgment should be exercised — not capriciously or fraudulently, but reasonably and with due regard to the rights of both the contracting parties.
See, also, Saalfield v. United States, 246 U. S. 610, 613. In the application of this rule to a particular case of a decision made under a contract many things must be considered, as is shown by a study of the three opinions of the Supreme Court in the case of Ripley v. United States, reported in 220 U. S. 491, 222 U. S. 144, and 223 U. S. 695, for the purpose of reaching a conclusion of ultimate fact as to whether in view of all facts and circumstances disclosed by the record and known by and available to the contracting officer, and which should have been considered by him, he carefully and impartially considered all the facts and circumstances reasonably, candidly, and in an unbiased manner for the purpose and with the desire to reach a fair, just, and intellectually honest decision in accordance with the true intent and meaning of the contract as disclosed by the language and purposes thereof, as well as by the specific provisions concerning the particular matter under consideration.
*602 In cases involving a written contract with the Government the contract, specifications, and drawings are in practically every case wholly prepared and written by the Government through persons authorized to do so. The printed contract form as a separate document contains a provision that such specifications and drawings as are prepared shall constitute a part of the contract. In these documents the Government sets forth rather specifically its rights, liabilities, and obligations, as well as those of the other party thereto, and, since all contract provisions are written by the Government, consideration must always be given in a suit based thereon to the matter of the intention of the Government as indicated by the language of the contract and the extent to which the successful bidder who signs the contract intends to agree when he executes it. See Callahan Construction Co. v. United States, 91 C. Cls. 538. Contractors who sign and agree to these contracts and specifications are not permitted beforehand to make changes therein or to insert therein provisions for the purpose of setting forth, as a part of the contract, their understanding and intention with reference to the various articles and specification pi’o-visions thereof. These matters are to be kept in mind and given such consideration as they merit in light of the evidence presented by the record in a case where the contention is made that the finding or the decision of the person authorized to decide was not made in good faith and was arbitrary, capricious, or so clearly erroneous as to justify the implication of bad faith. When such a contention is made and the issue as to whether the finding or decision involved was or was not consistent with good faith, or that it should be found to have been arbitrary or so grossly erroneous as to imply bad faith, is present, no question of personal animosity or calculated bias, prejudice, or actual dishonesty is necessarily involved in an ultimate finding of implied bad faith. One or more of the elements just mentioned might be present in some cases and, if it is, it should be considered, but that would be in an exceptional case and certainly not one typical of the cases which define the rules and the evidence to be considered and applied in an ultimate finding of fact that the decision should be held incon- *603 elusive because arbitrary or so grossly erroneous as to justify the implication of bad faith. Good faith, impartiality, or gross error, and implied bad faith are all to be considered by the court in a legal sense — that is, the extent to which, in the light of the facts and data known and available, they are present or absent in connection with the decision made and in connection with the duty and responsibility of the contracting officer under the terms of the contract under which he acts. A decision or finding may be held to be arbitrary when existing important facts, conditions, and express contract provisions should obviously have been considered and given due and proper weight, but were not. A decision may be found to be arbitrary when the facts show that the person given authority to decide took the position that the matter involved was a matter to be disposed of in his discretion when such was obviously not the case and he was required by the contract to consider and weigh facts, circumstances, and conditions, as well as to interpret and be governed by certain standards contained in the terms of the contract. Such actions, under proof sufficient to show that if the contracting officer had properly and reasonably considered the facts and contract provisions he should and probably would have reached a different conclusion, would not be consistent with good faith and would also be grossly erroneous and would justify a finding of implied bad faith, namely, that there was clearly lacking a faithful discharge of the duties and obligations imposed by the terms of the contract, as well as by the position of the officer as a fair and impartial arbiter.
In Saalfield, etc. v. United States, supra, the contract called for one hundred guns, the manufacture and delivery of which by the contractor depended upon a test gun of each caliber called for meeting certain standards specified under a provision of the contract, which stated that “the acceptance of the remainder of the same caliber will depend upon the type gun passing its test satisfactorily * * *. Both gun and carriage must endure these tests in all respects satisfactorily, both as to the strength of material and facility of operation.” The Supreme Court held at p. 613, citing Ripley v. United States, 223 U. S. 695, 701, 702, “ * * * *604 that the acceptance of additional guns was dependent on this one ‘passing its test satisfactorily,’ ” and further stated it was apparent from the provisions of the contract that the contract contemplated “that the Chief of Ordnance and his superior officer, the Secretary of War, were to decide, not arbitrarily, but candidly and reasonably, whether the gun had satisfied the required test.” The fact of implied bad faith in a legal sense may be inferred from the grossly erroneous nature of the finding or decision of the administrative officer. In addition to proof of gross error, additional evidence of animus against the contractor is not required any more than it would be of defendant in a case in which it seeks to overcome the finality of a decision of its agent upon the ground of gross error and lack of good faith. Neither is personal bias or prejudice necessary to be proved in addition to proof of error so gross as to warrant the court in inferring the fact of bad faith, or the total absence of good faith. A proper interpretation of the decided cases which have discussed the question seems to make rather plain what we have said above. In the concurring opinion of Judge Madden in Bein v. United States, (No. 44619, ante, pages 144, 167), it is pointed out that the court may review an administrative decision when all the substantial evidence and relevant data known to the officer and normally considered in arriving at such a decision are against it. Under such facts the decision would be so grossly erroneous as to justify the inference of bias or bad faith. It is difficult to see just what other type of evidence would be required to sustain a conclusion of fact of the absence of good faith or of implied bad faith. It would not seem necessary to a finding of implied bad faith that the evidence must in every case show that the person authorized to decide willfully or deliberately disregarded the merits of the dispute or question before him in order to decide it against the contractor. The statement frequently made that a finding or a decision honestly arrived at, although erroneous, will not be upset or reviewed by the court would seem to mean no more than that where there has been an honest endeavor to obtain all the facts and relevant data and to candidly and reasonably weigh and consider them in an effort *605 to arrive at a fair and reasonable decision, such decision will be upheld although the court, upon the facts, is of the opinion that it would have reached a different conclusion or that a different decision should be made upon such facts. See Martinsburg & Potomac Railroad Company v. March, 114 C. Cls. 549. What has been said above conforms to what was said in the concurring opinion of Judge Whitaker in Bein v. United States, supra, in which it is pointed out that there was no reasonable basis in the contract, or in the evidence, to support the rulings of the officers in question— that no reasonable man candidly and fairly considering all the facts and relevant data could have interpreted the contract documents as they did and that, this being so, the conclusion of fact was reached by the court that these officers did not render their decisions impartially, i. e., in good faith.
Whether there was, when the administrative decision was made, such an absence of impartiality and good faith as to imply bad faith is a conclusion of fact arrived at by the use of an objective standard. The early decisions of the Supreme Court with reference to finality of a decision of an officer are, generally, that such decision may not be upset “except for fraud or failure to exercise an honest judgment, or, unless so grossly erroneous as to imply bad faith.” See Kihlberg v. United States, 97 C. Cls. 898, 402; United States v. Gleason, 175 U. S. 588, 607. These cases did not discuss what was meant by implied bad faith, but the last-mentioned ground — that a decision would be upset if so grossly erroneous as to imply bad faith — seems to make clear that the court was aware of the difficulties of proving bad faith and intended that it should be understood that bad faith in a legal sense could be inferred from the grossly erroneous character of the decision itself. This conclusion seems to us to be supported by a study of the three opinions of the Supreme Court in the case of Ripley v. United States, supra. In the first opinion of the Supreme Court in that case, reported at 220 U. S. 491, the court stated at page 496 that it was the clear duty of this court, in dealing with the question,.^ good or bad faith, not to leave the subject in doubt, but, “to explicitly find whether or not that which it states was manifest, was or was not known to the inspector and *606 whether that subordinate official acted in good or bad faith in the various refusals * *
It would seem clear from a study of the decisions of the Supreme Court on the subject of good faith or gross error and implied bad faith that they recognize that implied bad faith may be inferred from the grossly erroneous character of the decision itself — that is to say, that implied bad faith is to be inferred when the proof shows that the error is so grossly erroneous that no officer acting in good faith under such a responsibility, and acting reasonably and candidly with due regard to the rights of both parties could fairly, justly, and honestly have reached the decision in question upon a fair, unbiased, and impartial consideration of the facts, circumstances, conditions and the contract terms concerning the matter of the question involved. Erroneous decisions are nearly always erroneous in varying degrees and it is the degree to which a particular decision is erroneous that determines whether, in the light of all the facts and relevant data relating to the gross error, it will be treated as final and conclusive or will be set aside and a proper decision made by the court. The mere fact that a decision is simply erroneous on the facts before the contracting officer making the decision is clearly not enough to upset it. The fact that the decision was very erroneous likewise is not sufficient to justify its being overturned if the officer appears to have known or considered fairly the facts and circumstances, or if there is no proof that he did not do so it will be presumed that he did consider them. Finally, as the court pointed out in the second opinion in Ripley v. United States, 222 U. S. 144, 147, the decision or finding of the officer may be found by the court to have been grossly erroneous, nevertheless it cannot be upset if under all the facts and circumstances the gross error may still be regarded under all of the evidence as consistent with good faith upon the part of the officer; but such gross error will justify the court in upsetting the decision if the extent of the gross error and the character thereof is shown by proof of facts and circumstances known to or available to the officer to have been inconsistent with good faith — that is, wholly inconsistent with the kind of a decision which a fair-minded person would have reached upon a candid, reasonable, and impartial *607 consideration of all the known and available relevant facts and data.
As a general rule of approach and consideration of the question of good faith, gross error, and implied bad faith, the court may examine the officer’s decision on the question involved and then compare such decision in the light of the evidence and the facts and relevant data known or available to the officer with the kind of decision which should have been made after a full, candid, and impartial review of all such facts and relevant data. If upon the evidence the court believes that the decision although grossly erroneous is nevertheless consistent with good faith and the exercise of a fair and honest judgment, that it is consistent with an effort on the part of the officer to act impartially and to deal fairly and with due regard to the rights of both parties, as the Supreme Court has said he must, then the decision will not be upset. On the other hand the decision will be overturned and disregarded if upon a candid, reasonable, and impartial consideration of all the facts, conditions, and relevant data known or available to the contracting officer, which should have been considered and weighed by him, the court believes that there is too great a gap between the grossly erroneous decision which the officer made and the decision which should or doubtless would have been arrived at if he had in good faith, candidly, and reasonably considered all the facts and relevant data with regard to the rights of both parties. In other words, as Judge Whitaker said in his concurring opinion in Bien v. United States, supra, if the Court is satisfied that no reasonable man could have determined the dispute upon all the relevant facts and data as the administrative officer did, then the court is justified in inferring, as a fact, that the decision was not made impartially or in good faith. If this should not be the process contemplated by the rule that a decision may be set aside if “so grossly erroneous as to imply bad faith,” it is difficult to see how the rule could ever be consistently and properly applied within the realm of the probable intention of parties to a contract.
Having found and concluded in this case that the actions of the contracting officer with reference to the use of the mine cars on the work and the use of the third shovel were upon *608 the facts and under the terms and conditions of the contract arbitrary and so grossly erroneous as to imply bad faith, there is left for consideration the question of whether the decision of the contracting officer was intended to be final or whether plaintiff was required under the contract and specifications to appeal those rulings to the head of the department within thirty days or lose his right to maintain suit for recovery of damages for breach of contract.
Plaintiff did not appeal to the head of the department because he did not consider that he was required to do so under the terms of the contract with reference to the particular decisions of the contracting officer. In this we are of opinion that plaintiff was right for several reasons. After plaintiff had abandoned the work for breaches of the contract, it appears from letters written to plaintiff that the contracting officer endeavored for the first time to impose upon plaintiff the obligation of appealing from his decisions under the provisions of Art. 12 of the printed contract form. But we are convinced from a careful study of the record that this was an afterthought and that neither the contracting officer nor his authorized representative who wrote the specifications under the supervision of the contracting officer had ever before that time considered that their decisions with reference to the mine cars and the use of the third shovel were not made final by the contract, or that such decisions were required to be appealed to the head of the department. On the contrary, the record shows that on occasions when plaintiff was protesting to the contracting officer and his authorized representative that the action which they had taken with respect to the mine cars was unauthorized by and contrary to the terms and conditions of the contract plaintiff was told by them, in effect, that they had full and complete authority to decide anything in connection with the work, that the decisions of the contracting officer were final, and that plaintiff could do nothing about it. Certainly the decision of the contracting officer to use the third shovel was not a decision of a question of fact, and he did not then and has not since claimed that it was. He insisted at the time that the contract gave him the right to place the third shovel on the work.- The language *609 of Art. 12 of the printed contract form, as well as that of the specifications, was clearly to the effect that the decision of the contracting officer should be final with reference to the matters specifically mentioned therein, and unless something can be found in the contract and specifications or in the nature of the work or the conditions under which and the place at which it was to be performed to indicate that something else was intended full effect must be given to the ordinary and natural meaning of the language used. Art. 1 of the printed contract made the specifications a part thereof; and Art. 12 of the printed contract stated that “Except as otherwise specifically provided in this contract,” disputes on questions of fact arising under the contract should be decided by the contracting officer subject to written appeal by the contractor within thirty days to the head of the department concerned, whose decision would be final. The principal exception to Art. 12 is found in paragraph 15 of the specifications, quoted in finding 10, which provides that “The decision of the contracting officer as to the suitability of equipment and operators, and as to adequacy of cooperation, shall be final.” See, also, paragraph 10 (b), finding 4; paragraph 12, finding T; paragraph 5, finding 8, and paragraph 14, finding 0.
When this phase of the case is considered we think that the contracting officer so interpreted the contract until October 21, and we also think it is manifest from the way in which the specifications wrere worded that it was intended at the time the contract and specifications were prepared for execution that as to the matter specifically referred to in the specifications the decision of the contracting officer should in the circumstances be final if made in good faith rather than a decision by the head of the department. The work here involved was located approximately 5,000 miles from the office of the head of the department. The location of the work and the character thereof, especially with reference to the specific matters concerning which the specifications made an exception to the provisions of Art. 12 of the printed contract form relating to appeal, made it advisable, if not necessary, as well as in the interest of the Government, that such matters be finally decided and disposed of upon the *610 ground as the work progressed. Cf. Ripley v. United States, 223 U. S. 695, 696, 702. The matter of whether the mine cars were capable of dumping in a satisfactory manner was one which only the contracting officer was in a position properly to decide. The same is true with reference to the matter of whether the operation of the equipment, the operators, and the mine cars were satisfactory “under the provisions of this specification” or whether the equipment, operators, or mine cars were suitable under the terms of the contract to perform the work required. It seems reasonable to suppose that if the Government had intended in this situation that the final decision as to these matters should be made only by the head of the department, the contract or specifications would have so stated. Unquestioned authority was given the Secretary of War to make the contract and he in contemplation of law made it when it was signed by the contracting officer and the Division Engineer, and as the head of the department he doubtless could have reviewed the decisions of the contracting officer which were made in this case had plaintiff taken the matter to him, United States v. Barlow, 184 U. S. 123, 137, but under the language and terms of the contract plaintiff was not compelled to do so as a condition to his right to sue. If it had been intended by the Government when the contract was prepared that the decision with reference to the particular matters with respect to which the language vested authority in the contracting officer to decide, even without approval of the Division Engineer, should be finally decided by the head of the department, we think the specifications would have contained, in addition, some language to indicate such an intent. For the reasons stated we think this case is to be distinguished from the case of Fred R. Comb Co. v. United States, 100 C. C. 259.
Even if we assume, which assumption we think is not justified in this case, that decisions of the contracting officer on questions of fact were required by this contract to be appealed by the contractor to the head of the department and that only the decisions of the head of the department were final, we do not think that under the facts and circumstances disclosed by the record the decisions which the con *611 tractor actually made were decisions of questions of fact within the meaning of Art. 12. The only factual feature of the decision with reference to the slowness of the mine cars was that the defendant and not plaintiff was failing to perform its duty under the contract, and there is practically no dispute about that. It would be odd to say that the contractor was required by Art. 12 of the contract to protect the Government against actions of its own officers. However, plaintiff did everything he could to convince the contracting officer that the Government could easily perform the particular duty required of it under the contract, and it would seem obvious that plaintiff was not required to do more. If the mine cars were not satisfactory under the terms of the contract, plaintiff had a right to make them satisfactory, but if, as was the case, the Government wanted greater capacity, it was required to change the terms of the contract by mutual consent and pay for such change. C. and N. W. R. R. Co. v. United States, 104 U. S. 681, 685. Since it refused to do so it breached the contract. The decision with reference to the use of the third shovel is not claimed to have been a decision of a question of fact.
The nest question is whether the allegations of the petition are sufficient to entitle plaintiff to recover such damages as he may have sustained by reason of breaches of the contract by defendant. The petition alleges a breach of the written contract and prays for general relief. The petition sets forth facts in sufficient detail to show that defendant breached the contract, and the petition specifically alleges that by the actions of the contracting officer the defendant “repudiated and breached the said written contract and prevented the plaintiff from continuing with the operation of the said machinery in the manner provided by the said contract * * In addition plaintiff described the actions of the contracting officer and alleged that' from these various actions of the contracting officer there arose an implied contract on the part of the Government that plaintiff would be paid the reasonable value of all labor, services, material, and equipment provided by him plus a reasonable profit.
Upon all of the facts as alleged in the petition, plaintiff prayed “that process issue according to law and that upon a *612 hearing of the facts and law herein, this Court grant judgment against said Defendant in favor of the Plaintiff in the sum of $48,975.01, together with interest at the legal rate from January 7, 1937, and for such other relief as may be meet and proper in the premises.”
Under these allegations and the prayer for general relief the court may allow plaintiff judgment by way of compensation for the damages sustained in such amount as is fairly and reasonably shown by the proof to have resulted from defendant’s breaches of the written contract. Clark v. United States, 95 U. S. 542, 543; United States v. Behan, 110 U. S. 338, 347; Anvil Mining Co. v. Humble, 153 U. S. 540, 551, 552; Bulkley v. United States, 7 C. Cls. 543, 549, 550, affirmed 19 Wall. 37, 41.
The defendant takes the position that plaintiff has grounded his action entirely and solely upon a contract implied in law and contends that inasmuch as this court does not have jurisdiction to hear and determine cases arising under contracts implied in law the petition must be dismissed. But we think this contention of the defendant is not well taken in view of the allegations of the petition and the facts set forth therein. The fact that a claimant may, in addition to alleging a breach of the written contract and praying for general relief, also claim on quantum meruit under an implied contract not shown to have been a contract implied in fact does not deprive this court of jurisdiction to adjudicate the claim and render judgment for damages proven for breach of the written contract if the damages so proven are within the fair scope of the facts alleged in the petition. The Court so held in United States v. Behan, supra, at p. 347, in which the Court said:
The particular form of the petition in this case ought not to preclude the claimant from recovering what was fairly shown by the evidence to be the damage sustained by him. * * *. In a proceeding like the present, in which the claimant sets forth, by way of petition, a plain statement of the facts without technical formality, and prays relief either in a general manner, or in an alternative or cumulative form, the court ought not to hold the claimant to strict technical rules pf pleading, but should give to his statement a *613 liberal interpretation, and afford him such relief as he may show himself substantially entitled to if within the fair scope of the claim as exhibited by the facts set forth in the petition.
See also, John Hays Hammond v. United States, 95 C. Cls. 464, and the cases therein cited at pp. 469, 470.
In Clark v. United States, 95 U. S. 539, the court also said at pp. 542, 543:
We do not mean to say that, where a parol contract has been wholly or partially executed and performed on one side, the party performing will not be entitled to recover the fair value of his property or services. On the contrary, we think that he will be entitled to recover such value as upon an implied contract for a quantum meruit. In the present case, the implied contract is such as arises upon a simple bailment for hire; and the obligations of the parties are those which are incidental to such a bailment. * * *.
If objected that the petition contains no count upon an implied contract for quantum meruit, it may be answered, that the forms of pleading in the Court of Claims are not of so strict a character as to preclude the claimant from recovering what is justly due to him upon the facts stated in his petition, although due in a different aspect from that in which his demand is conceived.
In Electric Boat Company v. United States, 66 C. Cls. 333, 377, the Court said:
The proof offered is in our opinion the best evidence of the loss available, and establishes with certainty the extent of the same. The judgment awarded is not the judgment sought in the petition, plaintiff contending for the amount of increases plus a reasonable profit. The court, however, is authorized under our forms of pleading to award a judgment in accord with the facts stated and proven, notwithstanding the absence of a count in the pleadings for the particular recovery. Wood et al. v. United States, 49 C. Cls. 119, Clark v. United States, 95 U. S. 539.
In Hampton, Executor, etc., v. United States, 82 C. Cls. 162, 172, 173, the Court said:
Plaintiff proves that the reasonable value for dredging the above quantity of material is $26,351.32, i. e., at the *614 rate of 32y2 cents per cubic yard, and for this sum judgment is sought, upon an alleged implied contract to pay for the same on the basis of quantum meruit.
The first important question is whether such a cause of action is available to plaintiff. The petition contains no allegation of breach of contract, no charge of misrepresentation or the withholding of information upon the part of the defendant. All that is alleged and established by the record is the fact that an error was made in the drawings of and by the defendants to which the contractor was entitled, and which when corrected caused the contractor to excavate under the contract a large quantity of material in excess of what he otherwise would have had to do.
The subject matter of the contract involved was manifestly dredging. The area to be dredged, and the depth, width, and length of the channel were approximately specified, and the contractor not only entered upon performance, but continued work under the contract and the supervision of defendant’s officials acting as inspectors and contracting officers. The fixed consideration for the contract was paid the contractor, less the retained percentages, and accepted. To now insist that the contractor’s rights are determinable as though no express written contract for the work claimed for existed, is, we think, untenable. * * *
The remaining vital issue is whether the plaintiff may recover for this item under the written contract set forth in the findings. We might well assume, in view of the allegations of the petition and plaintiff’s contentions thereunder, that defendant’s liability under the written contract is nonexistent. However, our rules of pleading exact consideration of the facts as established and alleged in the petition, ix’respective of plaintiff’s application of the same.
See, also, Bull v. United States, 295 U. S. 247, 263; Devlin v. United States, 12 C. Cls. 266; Cafe Ann Granite Co. v. United States, 20 C. Cls. 1; Parker v. United States, 26 C. Cls. 344; M. A. Long Co. v. United States, 79 C. Cls. 656.
In the case at bar it is true, as defendant contends, that there was no contract implied in fact with reference to the matters which form the basis of suit separate from or in addition to implications arising from the written contract. The contracting officer did not at any time promise expressly or impliedly to pay plaintiff a greater sum than the contract
*615 price at the rental rate stated therein. There was therefore no contract implied in fact. Hawkins v. United States, 96 C. Cls. 689, 697; Baltimore & Ohio Railroad Co. v. United States, 261 U. S. 592, 597. In the Hawkins case, sufra, the Court said, at pp. 697, 698:
When a special contract for work and services has been abandoned and put an end to, if the employer has derived some benefit from work done under it, he may be made liable upon an implied promise to make reasonable remuneration in respect to such work. * * *
Implied promises or promises in law exist only when there is no express promise between the parties — expres-sum faeit cessare taeitum. * * *.
* * *, ' where the service is performed under an express contract, there can be no recovery where there is no proof of a breach of the agreement. When there is a breach of the agreement, an action will lie for the breach; but, if there be no breach, no action will lie, as an implied assumpsit does not arise in such a case, unless it be shown that the parties have abandoned the express agreement, or have rescinded or modified it so as to give rise to such an implication. * * *
But we think it is immaterial to plaintiff’s right to recover in this case that there was no contract implied in fact. We think also that it is immaterial that recovery may not in the circumstances of this case be properly measured under the rule of quantum meruit, since this was a rental contract under which defendant used plaintiff’s employees and equipment until completion rather than a construction contract at a fixed sum, and, also the Government did not, when plaintiff ceased further performance, put an end to the completion of the contract, as was the case in Behan v. United States, supra, and Spearin v. United States, supra. Compare also Anvil Mining Co. v. Humble, supra, where the contractor was ordered to stop the work. In the Behan case, the Court said, at p. 345:
* * *. It does not lie, however, in the mouth of the party, who has voluntarily and wrongfully put an end to the contract, to say that the party injured has not been damaged at least to the amount of what he has been induced fairly and in good faith to lay out and expend (including his own services), after making *616 allowance for the value of materials on band; at least it does not lie in the mouth of the party in fault to say this, unless he can show that the expenses of the party injured have been extravagant, and unnecessary for the purpose of carrying out the contract.
In the instant case plaintiff ceased to perform further under the contract on October 7, 1936; the defendant did not put an end to the written contract but expressly continued it in force and proceeded to complete it with plaintiff’s force and equipment, and charged all costs of completion against the amount determined to be otherwise due under contract at the rental rate stated therein. Plaintiff’s abandonment of the work by reason of the breach by the defendant, was not a rescission of the contract, and plaintiff did not lose his right in these circumstances to claim damages for the use of and damage to his equipment during the period of completion and to object to unauthorized charges against him during the subsequent period of completion by defendant under the contract. Nor did he lose his right, when the work had been completed, to claim such balance as may have been due under the contract. Cf. Quinn v. United States, 99 U. S. 30, 32-34. If defendant had rescinded or put an end to the contract when plaintiff on October 7,1936, refused to perform further, and had abandoned the project or had completed the work itself and at its own cost, as was done in Behan v. United States, sufra, and Spearin v. United States, supra, the situation of the parties would have been different, and the rule of the Behan and Spearin cases for measuring damages in such a situation would have to be applied.
In Anvil Mining Co. v. Humble, supra, the Court, at pp. 561, 552, said:
It is insisted, and authorities are cited in support thereof, that a party cannot rescind a contract and at the same time recover damages for his non-performance. But no such proposition as that is contained in that instruction [to the jury]. It only lays down the rule, and it lays that down correctly, which obtains when there is a breach of a contract. Whenever one party thereto is guilty of such a bréach as is here attributed to the defendant, the other party is at liberty to treat the contract as broken and desist from any further effort on his part to perform; in other words, he may *617 abandon it, and recover as damages the profits which he would have received through full performance. [Only profits were claimed in this case.] Such an abandonment is not technically a rescission of the contract, but is merely an acceptance of the situation which the wrong-doing of the other party has brought about. Generally speaking, it is true that when a contract is not performed the pai’ty who is guilty of the first breach is the one upon whom rests all the liability for the non-performance. A party who engages to do work has a right to proceed free from any let or hindrance of the other party, and if such other party interferes, hinders, and prevents the doing of the work to such an extent as to render its performance difficult and largely diminish the profits, the first may treat the contract as broken, and is not bound to proceed under the added burdens and increased expense. It may stop and sue for the damages which it has sustained by reason of the non-performance which the other has caused.
It is clear from the facts alleged in the petition that plaintiff is seeking to recover compensation by reason of the acts of defendant which, it is alleged, constituted breaches of the written contract. The amount specifically computed and claimed under the implied contract theory may or may not equal the actual damages properly measured which the proof shows the plaintiff sustained by reason of breaches of the written contract by defendant. A plaintiff may, where the proof shows more damage than is claimed, be allowed to amend the prayer of his petition to conform to the proof. We think the allegations of the petition are sufficient to state a cause of action for damages for breach of contract.
The last question concerns the proper measure under the circumstances of this case of plaintiff’s damage and the amount thereof fairly and reasonably established by the proof. On this phase of the case it is argued by defendant that if it be assumed that there was a breach of the written contract plaintiff still could not recover as for the breach, since it does not appear from the record, nor from plaintiff’s brief, to what extent, if any, plaintiff was injured by the alleged breach of the contract. It is further argued that the proper and only measure of damage for breach of the contract is the difference between the amount actually *618 received by plaintiff and what he would have received had the defendant performed its part of the contract. In other words, it is argued, the question is simply: How much is plaintiff worse off because of the failure of the defendant to perform ?
We think the contentions of the defendant that plaintiff has not alleged facts sufficient to state a cause of action for breach of contract or that he has not fairly and reasonably proved an amount as damage sustained cannot be sustained. The defendant contends, in effect, for the rule of damage frequently stated that the amount that would have been received if the contract had been kept is the measure of damage if the contract is broken. That is, of course, one rule for measuring damages. But there are important variations of this rule to fit particular cases, depending upon the nature and effect of the breach and the extent of the actual loss resulting therefrom. There is no hard-and-fast rule for the measure of damages in every case for a breach of a contract.
There can be no doubt in this case that plaintiff has proved that the contract was breached and that he was damaged as a result of defendant’s breaches of the contract. We are of opinion that plaintiff has submitted proper and adequate proof as to the damages which resulted from defendant’s breaches, from which proof the measure of damages sustained by plaintiff and the amount of actual damages so sustained can be fairly determined by the Court with reasonable accuracy. Absolute certainty as to the amount of damages is not essential, this being a matter for determination according to the circumstances of each case. There is no objection to damages that they are difficult to ascertain, depending upon contingent and uncertain events, for in all actions for damages for breach of contract the foundation or underlying principle is full compensation for the wrong done. The general rule is that the compensation shall be equal to the injury. The breach is the standard by which the compensation is to be measured, and all that the law requires is that such damages be allowed as, in the judgment of fair men, directly and naturally resulted from the breach of the contract for which the suit is brought. Dow v. Humbert et al., 91 U. S. 294; Hetzel v. Baltimore & Ohio Railroad *619 Co., 169 U. S. 26, 37-39; Eastman Kodak Company v. Southern Photo Material Co., 273 U. S. 359; Story Parchment Co. v. Paterson Parchment Paper Co. et al., 282 U. S. 555, 562, 563; Baker v. Drake, 53 N. Y. 211, 220. In Hoffer Oil Corporation v. Carpenter, 34 Fed. (2d) 589, 592, the court said:
A person who has violated his contract will not be permitted to reap advantage from his own wrong, by insisting upon proof which, by reason of his breach, cannot be furnished. * * *.
A party, who has broken his contract, will not be permitted to escape liability because of the lack of a perfect measure of the damages caused by his breach. * * *.
A reasonable basis for computation, and the best evidence which is obtainable under the circumstances of the case and which will enable the jury to arrive at an approximate estimate of the loss, is sufficient.
Where a breach of a contract interferes with the proper performance of a contract in accordance with its terms, the injured party may recover damages to the extent at least of any loss which was the necessary consequence of such interference. United States v. Smith, 94 U. S. 214; Parish v. United States, 100 U. S. 500; United States v. Barlow, 184 U. S. 123. The fact that he might recover more by way of lost profits, if proven, is not fatal. As a part of the damage sustained for breach of contract, anticipated profits prevented by the breach may also be recovered where properly proven. Howard v. Stillwell and Bierce Manufacturing Company, 139 U. S. 199, 205, 206; United States v. Behan, 110 U. S. 338; Anvil Mining Co. v. United States, 153 U. S. 540, 549; Suburban Contracting Co. v. United States, 76 C. Cls. 533, 543.
Since compensation is a fundamental principle of damages for breach of contract, the party who fails to perform his contract or interferes with or prevents the other party from performing it according to its terms is justly bound to make good all damages that accrue naturally from the breach; and the other party is entitled to be put in as good a position pecuniarily as he would have been by performance of the contract. Miller, et al. v. Robertson, 266 U. S. 243, 257; Illinois Central Railroad Co. v. Crail, 281 U. S. 57, 63.
*620 In the present case the plaintiff in the petition, in which he alleged a breach of contract and prayed for general relief, made claim for the specific sum of $48,975.01 on the basis of the reasonable value of labor, services, and materials, furnished by plaintiff in an effort to perform the contract until October when the defendant, on that date, by reason of past actions and action then taken, rendered further performance by plaintiff in accordance with the contract impossible. This amount was computed on the basis of cost of labor, services, materials, insurance, and damage to tunnel shovels in the total amount of $49,377.14 plus a reasonable profit of 15 percent upon that sum amounting to $7,406.57, totaling $56,783.71. From this amount there was deducted the amount alleged to have been paid and received of $7,808.70, leaving a balance of $48,975.01. The correct figures on this basis of computation are set forth in findings 62 and 63, and they show a balance after deducting the correct amount of $7,818.70 paid to and received by plaintiff from defendant, of $47,693.17.
If in the circumstances of this case it were necessary to limit plaintiff’s recovery of damages for defendant’s breaches of contract to allowance of the costs of labor, services, and materials furnished, to the date on which plaintiff ceased to further perform the contract, and the damage to the tunnel shovels, it would be necessary to deny the item of profit for the reason that it has not been shown by clear and direct proof, which the law requires in connection with recovery of anticipated profits, what amount of profit plaintiff would have made if he had been permitted to perform the contract in accordance with its terms. It is not sufficient to the allowance of anticipated profits to use a percentage of expenditures on a cost-plus basis. Direct, as distinguished from speculative, profits must be proved. If plaintiff’s damages in this case are required under the petition and the proof to be measured as above stated, the amount recoverable would be $40,452.49. However, in view of the nature of this contract and in view of the nature of the breaches of this contract by defendant and the evidence of record, which shows with reasonable certainty the amount of various items of the actual damage sustained by reason *621 of defendant’s breaches and the amount still due under the contract as it was actually performed, we think the measure of plaintiff’s damages is not limited in this case to the cost of labor, services, and materials, furnished by plaintiff to the date on which he ceased to further perform the contract, less what he received from the defendant. Whether, in the circumstances of this case, plaintiff would be entitled to recover under the Behan and the Spearin cases, supra, at least the amount of $40,452.49, computed as above-mentioned, we need not decide for the reasons (1) that in this case we are dealing with a contract for rental of equipment rather than a construction contract; (2) that plaintiff proceeded for a month and a half, notwithstanding defendant’s breaches of the contract, in an effort to perform; (3) that when the defendant again breached the contract in another important respect and plaintiff refused to continue in his attempt to perform, the defendant, instead of terminating or rescinding the contract, expressly kept it in force and completed it with plaintiff’s employees, equipment, and materials at plaintiff’s expense; and (4) that the proof establishes an amount of damages actually sustained in performance of the contract to completion with plaintiff’s employees and equipment in the way in which the work was actually performed and completed.
In the case at bar the proof submitted by plaintiff establishes and we have found as facts (see tabulation in finding 64) that plaintiff suffered actual damages in connection with the use of his equipment and employees in performance of the contract in suit, including the amount still due under the contract, of $47,852.85. In addition to the items of damage making up this amount, plaintiff might also have recovered as an item of damage the profit which he lost under the rental contract by reason of defendant’s breaches thereof, which resulted in the contract being completed about eleven months earlier than it would have been completed, except for such breaches by the defendant, but the proof does not show what the amount of such profit would have been (see finding 55).
With reference to the seven items of damages sustained by plaintiff totaling $47,852.85, as set forth in finding 64, *622 little need be said in addition to what has been set forth in the findings.
The first item relates to penalties totaling $2/755.87 charged against plaintiff under purported authority of Par. 12 of the specifications quoted in finding 4 for a total of 417 hours’ and 32 minutes’ delay. This penalty did not come under the liquidated damage provision of the contract as contained in Art. 5 and in Par. 5 of the specifications. The only liquidated damage provided for in the contract was for failure of plaintiff to commence operations at full capacity within 32 days after receipt of notice of award of contract.
The proof shows and we have found as a fact that the delay for which plaintiff was charged a penalty of one-half of the rental rate for each shovel so delayed was mainly, if not entirely, the result of defendant’s breach of the contract through the use of trucks, tractors, and bulldozers. For this reason the defendant did not have the right to charge plaintiff with this penalty. United States v. United States Engineering and Contracting Co., 234 U. S. 236; Greeley Iron Works v. United States, 66 C. Cls. 328; Standard Steel Car Co. v. United States, 67 C. Cls. 445; Sun Shipbuilding & Dry Dock Co. v. United States, 76 C. Cls. 154; Graybar Electric Co., Inc., v. United States, 90 C. Cls. 232. The Government cannot claim the right to retain this penalty on the ground that some delay for which a penalty might have been asserted might have occurred in any event. By its breaches of the contract the defendant rendered it impossible to determine what delay, if any, would otherwise-have occurred.
What has been said above with reference to Item 1 sufficiently explains Item 2, in the amount of $2,755.87. This amount represents the unpaid rental due under the contract for the period of delay above mentioned, which rental the defendant deducted in addition to the penalty collected. Since the defendant, rather than plaintiff, was responsible for this delay, plaintiff is entitled to recover this unpaid rental.
The third item of damage relates to the use of additional 30-pound rail which the contracting officer compelled plain *623 tiff to furnish and which the proof shows was neither necessary nor required under terms of the contract. The cost of this additional rail was $3,160.69. This action of the contracting officer was a breach of the contract as shown by finding 33, and plaintiff is entitled to recover this amount.
The fourth item of damage relates to the cost of $4,539.83 (finding 50) for extra spare parts for the shovels purchased by defendant and charged to plaintiff against amounts otherwise determined to be due under the contract during the period of completion of the contract by defendant.
The proof satisfactorily shows that these extra parts were made necessary by reason of defendant’s breach of the contract which resulted in injury and damage to the mechanism of the shovels, for which the extra parts were used, and if the defendant had not breached the contract by using trucks instead of mine cars these extra parts would not have been necessary. Plaintiff is therefore entitled to recover this amount.
The fifth item of damages represents the reasonable rental value of the third 60 hp. shovel used by defendant on the work in addition to two 30 hp. shovels specified in Art. 1 of the contract. The defendant clearly did not have the right under the contract to use this third shovel on the work without becoming liable to plaintiff for the reasonable rental value thereof, which the evidence satisfactorily shows (finding 44) was $10,130.40 for the period during which it was used from October 13, 1936, to January 7, 1937, inclusive. This shovel was more powerful and had a much larger capacity than either of the 30 hp. shovels. Plaintiff is entitled to recover this amount.
The sixth item relates to damage in the amount of $21,-331.25 to the three shovels (finding 60) as a direct result of defendant’s breach of the contract. The proof shows that these shovels were damaged by defendant by the use of the trucks to such an extent that at the end of the work they were valueless, except for junk, and that if the defendant had not breached the contract by using trucks in connection with the operation of these shovels they would have been in good condition at the end of the work, ordinary wear and tear of not more than 10 percent of their value *624 at the beginning of the work excepted; such wear and tear and the junk value of the machines have been deducted from their actual fair market value at the beginning of the work in arriving at the damage of $21,331.25 found to have been sustained. Plaintiff is entitled to recover this amount.
Item 7 represents the amount of $3,179.04 still due under the contract, including the retained percentages as computed by defendant (finding 50). This amount plaintiff is also entitled to recover.
Plaintiff also claims interest on the damages sustained, but under the provisions of section 177 of the Judicial Code interest as a part of damages for breach of contract cannot be allowed.
The total of the items we have found to be recoverable is within the total amount claimed by plaintiff in the prayer of his petition. Judgment will be entered in favor of plaintiff for $47,852.85. It is so ordered.
Whaley, Chief Justice, concurs in the result only.